# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

OSCAR J. BROWNFIELD,
            *Plaintiff-Appellant,*

v.

CITY OF YAKIMA,
            *Defendant-Appellee.*

No. 09-35628

D.C. No.
2:08-cv-03005-
RHW

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Robert H. Whaley, Chief District Judge, Presiding

Argued and Submitted
April 8, 2010—Seattle, Washington

Filed July 27, 2010

Before: Michael Daly Hawkins, Carlos F. Lucero,* and
N. Randy Smith, Circuit Judges.

Opinion by Judge Lucero

---

*The Honorable Carlos F. Lucero, United States Circuit Judge for the
Tenth Circuit, sitting by designation.

10815

---

**COUNSEL**

John G. Bergmann, Helsell Fetterman, LLP, Seattle, Washington, and Lish Whitson, Lish Whitson, PLLC, Seattle, Washington, for the plaintiff-appellant.

Jerry J. Moberg, Jerry Moberg & Associates, Ephrata, Washington, for the defendant-appellee.

---

**OPINION**

LUCERO, Circuit Judge:

Oscar J. Brownfield appeals the district court's grant of summary judgment in favor of the City of Yakima on his claims for violations of the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA"), and for First Amendment retaliation. We hold that the City did not violate Brownfield's rights under the ADA by requiring a fitness for duty exam ("FFDE") after he repeatedly exhibited emotionally volatile behavior while serving as a police officer, that his complaints regarding a coworker with whom he shared duties did not address matters of public concern, and that his FMLA claim lacks merit. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

**A**

Brownfield began working as a police officer for the City of Yakima Police Department ("YPD") in November 1999.

Approximately one year later, he suffered a closed head injury in an off-duty car accident. After recovering from symptoms including reduced self-awareness, Brownfield returned to full duty in July 2001. He received positive performance evaluations and was awarded several commendations over the next three years.

**B**

In June 2004, Brownfield complained to his superior, Sergeant Amos, about Officer Dejournette, Brownfield's community service partner for Police Athletic League ("PAL") and Drug Abuse Resistance Education ("DARE") matters. In an interoffice memo titled "Unethical work practices," Brownfield wrote that Dejournette neglected his duties with respect to the DARE program to work on fraud matters, forcing Brownfield to complete tasks assigned to Dejournette. Brownfield complained that he "was not recommended for the SWAT team because of PAL and DARE. It seem[ed] unfair that Dejournette [could] work on fraud stuff and disregard DARE." The memo further took issue with Dejournette's use of comp time and overtime. In particular, Brownfield was disturbed that Dejournette was given twenty hours in "time owed" because Lt. Merryman, another superior, requested Brownfield "spend more hours on the development of PAL, but ha[d] never offered [him] time owed as a reward." Brownfield continued, "If Lt. Merryman is giving Dejournette time owed for work with PAL it would be a great dishonor to [a third officer] and [Brownfield] since [they] give an enormous amount of time to PAL without compensation." Finally, Brownfield argued that Dejournette and Merryman were too friendly with each other.

Over the next year, Brownfield compiled notes on Dejournette's perceived shortcomings. These notes detail Dejournette's failure to complete reimbursement requests, grant applications, and time sheets in a punctual manner, his continued use of overtime and comp time, and his generally "lacka-

daisical approach to PAL duties.” In May 2005, after
Merryman reprimanded Brownfield for failing to schedule an
event, Brownfield forwarded his notes to YPD Chief Sam
Granato. Shortly after forwarding his notes, Brownfield com-
posed a second email to Granato complaining that Dejournette
closed the PAL facility early for illegitimate reasons.

On May 11, 2005, Brownfield, Merryman, and Amos met
to discuss Brownfield’s problems with Dejournette. Midway
through the meeting, Brownfield used an expletive in stating
that he needed to talk to a union representative. Despite an
order from Merryman to remain in the room, Brownfield
stood up and left. When Amos found Brownfield speaking to
another officer, Brownfield swore at him and demanded he
leave the room. Brownfield was temporarily suspended for
insubordination as a result of this incident. He later explained
that he had expected to meet with Granato and was concerned
that the meeting included Merryman, who was the subject of
some of his complaints. Brownfield stated that he was “con-
sumed” with anger and fear, and that he recognized that he
needed to take a break.

## C

In September 2005, four incidents occurred that, together
with the above-described confrontation, led the YPD to refer
Brownfield for an FFDE. First, Brownfield engaged in a dis-
ruptive argument with another officer during muster. A ser-
geant reported that when Brownfield learned that YPD was
investigating him—but not the other officer—he became visi-
bly upset, was swearing, and was “just not really speaking full
sentences.”

Second, Brownfield reported that he felt “himself losing
control” during a traffic stop. According to a YPD sergeant,
Brownfield reported that a young child riding in a vehicle he
pulled over began taunting him during the stop. Brownfield
became upset, his legs began shaking, and he “wasn’t sure

what he was going to do." Brownfield calmed down when a backup officer arrived.

Third, the YPD received a domestic violence call from Brownfield's estranged wife, Leticia.[1] Leticia reported that she and Brownfield began arguing when she stopped at his apartment to see their children. As she was backing out of a doorway, Brownfield allegedly struck her by slamming the door. Brownfield disputed this version of events, and no charges were filed.

Finally, a YPD officer reported that Brownfield made several statements that caused him concern. The officer told a YPD captain that Brownfield made comments such as "It's not important anyway," "I'm not sure if it's worth it," and "It doesn't matter how this ends." After hearing this report, Captain Copeland placed Brownfield on administrative leave and ordered him to undergo an FFDE.

**D**

Dr. Decker conducted the FFDE on October 19, 2005. She diagnosed Brownfield as suffering from "Mood Disorder due to a General Medical Condition with mixed features," which manifested itself in "poor judgment, emotional volatility, and irritability" and which could be related to Brownfield's 2000 head injury. Dr. Decker concluded that Brownfield was unfit for police duty and that his disability was permanent. Brownfield was transferred from administrative to FMLA leave.

In December 2005, Brownfield was injured in another off-duty car accident. He suffered minor back and neck injuries that were treated by his primary care physician, Dr. Gondo. On February 3, 2006, Dr. Gondo signed a release form stating that Brownfield "[could] perform the physical activities described in the job analysis" and referencing his FMLA

---

[1]Brownfield was going through a divorce at the time.

leave status. A report attached to the document described
Brownfield's recent injuries, but not his preexisting psycho-
logical problems. YPD forwarded Dr. Decker's report to Dr.
Gondo and asked whether he would defer to its findings, and
if not, to provide his mental health qualifications and basis for
disagreement. Dr. Gondo stated that he would not defer, but
failed to respond to the latter inquiries.

In May 2006, the City informed Brownfield that it would
hold a pre-termination hearing with respect to his employment
with the YPD. In response, Brownfield emailed a YPD cap-
tain reiterating his complaints about Dejournette and insinuat-
ing that Dejournette may have stolen PAL funds. Brownfield
advised: "I don't think it would be a good choice for the chief
to fire me prior to the independent audit, but that's just me."

Prior to the hearing, Brownfield obtained a second opinion
from a Dr. Mar. Dr. Mar agreed with Dr. Decker that Brown-
field was unfit for duty due to his "emotional, cognitive,
behavioral, and physical problems." However, Dr. Mar
believed that Brownfield's problems might be amenable to
treatment. The City continued Brownfield's pre-termination
hearing pending treatment and further evaluation by Dr. Mar
and Dr. Decker.

In December 2006, Dr. Mar reported that Brownfield was
progressing well and would be able to return to duty at an
unspecified date with continued treatment. Brownfield
refused to return to Dr. Decker, leading YPD to order an
FFDE with another doctor, Dr. Ekemo. Brownfield attended
an initial exam in February 2007, and Dr. Ekemo scheduled
a second visit with Brownfield to complete his evaluation.
However, Brownfield refused to attend the follow-up session.

The City informed Brownfield that he would likely be ter-
minated unless he cooperated in the FFDE, but Brownfield
again refused. A pre-termination hearing was held on March
19, 2007. City Manager Richard Zais determined that Brown-

field was insubordinate and unfit for duty. Brownfield was terminated on April 10, 2007.

**E**

On January 8, 2008, Brownfield filed suit in federal court alleging violations of the ADA and FMLA, First Amendment retaliation, and related state law claims. The district court granted summary judgment in favor of the City, dismissed Brownfield's federal claims with prejudice, and declined to exercise supplemental jurisdiction over the state law claims. Brownfield appealed.

**II**

We review a district court's grant of summary judgment de novo. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). In doing so, "[w]e must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 746 (9th Cir. 2003).

**A**

[1] Brownfield alleges that the City violated the ADA by requiring him to submit to the FFDEs. Under 42 U.S.C. § 12112(d)(4)(A), an employer may not require a medical examination to determine whether an employee is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." In interpreting the "business necessity" standard in another ADA context, we have cautioned that it "is quite high, and is not to be confused with mere expediency." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (quotations and alteration omitted) (discussing "business necessity" with respect to qualification standards).

Relying on *Yin v. California*, 95 F.3d 864 (9th Cir. 1996), Brownfield contends that the business necessity standard cannot be met without a showing that an employee's job performance has suffered as a result of health problems. We disagree. In *Yin*, we considered only "whether the state may compel an employee with a prolonged and egregious history of absenteeism and a record of on-the-job illnesses to undergo a fitness-for-duty medical examination." *Id.* at 866. Faced with an employee whose job performance was affected by medical issues, we held that "when health problems have had a substantial and injurious impact on an employee's job performance, the employer can require the employee to undergo a physical examination designed to determine his or her ability to work." *Id.* at 868. We did not hold that these are the only circumstances that constitute business necessity.

**[2]** Although this circuit has yet to address whether an employer may preemptively require a medical examination, other courts have answered in the affirmative. In *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999), the Eleventh Circuit considered the legality of an FFDE for a police officer who displayed "unusually defensive and antagonistic behavior towards his co-workers and supervisors," but whose job performance was otherwise satisfactory. *Id.* at 934. Recognizing that "[p]olice departments place armed officers in positions where they can do tremendous harm if they act irrationally," the court held that the ADA does not "require a police department to forego a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." *Id.* at 935; *see also Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims . . . .").

Several district courts have reached similar conclusions. In *Mickens v. Polk County School Board*, 430 F. Supp. 2d 1265 (M.D. Fla. 2006), the court noted that an employer could sub-

ject itself to liability for negligent hiring or retention by turning a blind eye toward an employee's erratic behavior. *Id.* at 1280. It held that, "[a]s a matter of law, a school board's psychological examination of an employee is both job-related and consistent with a business necessity if that employee exhibits even mild signs of paranoid or agitated behavior that causes the school administration to question the employee's ability to perform essential job duties." *Id.* (quotations omitted). Similarly, in *Miller v. Champaign Community Unit School District Number 4*, 983 F. Supp. 1201 (C.D. Ill. 1997), the court condoned a psychiatric examination of an elementary school custodian. Focusing on the employee's daily interactions with school-aged children, the court ruled that "a psychiatric examination is job-related and consistent with business necessity in any case where an elementary school employee exhibits paranoid or agitated behavior that causes the school administration to be concerned about the personal safety of those in contact with the employee." *Id.* at 1206-07.

We agree with these courts that prophylactic psychological examinations can sometimes satisfy the business necessity standard, particularly when the employer is engaged in dangerous work. However, we must be keen to guard against the potential for employer abuse of such exams. Section 12112(d)(4)(A) prohibits employers from using medical exams as a pretext to harass employees or to fish for non-work-related medical issues and the attendant "unwanted exposure of the employee's disability and the stigma it may carry." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 n.8 (6th Cir. 1998).

**[3]** We reiterate that the business necessity standard "is quite high, and is not to be confused with mere expediency." *Cripe*, 261 F.3d at 890 (quotations and alteration omitted). Nevertheless, we hold that the business necessity standard may be met even before an employee's work performance declines if the employer is faced with

significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (quotation omitted); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003) (medical examination permissible "when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties").

**[4]** As the "reasonable person" language suggests, this test is objective. *See Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) ("The ADA's requirement that [a medical examination] be consistent with business necessity is an objective one."). The employer bears the burden of demonstrating business necessity. *See Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Conroy*, 333 F.3d at 97.

**[5]** We agree with the district court that the City had an objective, legitimate basis to doubt Brownfield's ability to perform the duties of a police officer. Undisputed facts show that Brownfield exhibited highly emotional responses on numerous occasions in 2005, four occurring in a single month immediately prior to his referral: He swore at a superior after abruptly leaving a meeting despite a direct order to the contrary; he engaged in a loud argument with a coworker and became extremely angry when he learned the incident was being investigated; he reported that his legs began shaking and he felt himself losing control during a traffic stop; his wife called police to report a domestic altercation with Brownfield; and he made several comments to a coworker such as "It doesn't matter how this ends."

**[6]** Brownfield attempts to explain away each incident by providing background facts suggesting his reactions were entirely reasonable and by challenging the third-party reports as factually inaccurate, but he does not dispute that he reacted as described or that the third-party reports were made to the YPD. Although a minor argument with a coworker or isolated instances of lost temper would likely fall short of establishing business necessity, Brownfield's repeated volatile responses are of a different character. Moreover, our consideration of the FFDEs' legitimacy is heavily colored by the nature of Brownfield's employment. Police officers are likely to encounter extremely stressful and dangerous situations during the course of their work. *See Watson*, 177 F.3d at 935 ("Police departments place armed officers in positions where they can do tremendous harm if they act irrationally."). When a police department has good reason to doubt an officer's ability to respond to these situations in an appropriate manner, an FFDE is consistent with the ADA. Reasonable cause to question Brownfield's ability to serve as a police officer was present here.[2]

## B

**[7]** Brownfield also appeals the district court's dismissal of his First Amendment retaliation claim. Although public employees "do not shed their First Amendment rights simply because they are employed by the government," courts considering a claim such as Brownfield's must carefully balance "the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the pub-

---

[2]Brownfield also argues that he was discharged in retaliation for protected ADA activity, i.e., refusing an unlawful request that he submit to a medical examination. However, Brownfield concedes that his ADA retaliation claim must stand or fall with his § 12112(d)(4)(A) claim. Because we conclude that the referral was not unlawful, Brownfield's retaliation claim also fails.

lic services it performs through its employees." *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir. 2009) (quotation and alteration omitted). To conduct this balancing, we employ a sequential five-step test, considering:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

The district court determined that Brownfield failed at the first step of the *Eng* test. Whether an employee's speech addresses a matter of public concern is a question of law, *id.*, that "must be determined by the content, form, and context of a given statement, as revealed by the whole record," *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

**[8]** This court has broadly described two categories of speech: that which "can fairly be considered to relate to any matter of political, social, or other concern to the community," *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) (quotation omitted); and that which "deals with individual personnel disputes and grievances" such that "the information would be of no relevance to the public's evaluation of the performance of governmental agencies," *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). The former is protected; the latter is not. "[T]he essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Desrochers v. City of San Bernardino*,

572 F.3d 703, 709 (9th Cir. 2009) (quoting *Connick*, 461 U.S. at 147).

**[9]** We conclude that it was proper for the district court to hold that the speech at issue was decidedly personal. Brownfield complained that his community services partner, Dejournette, was lazy and incompetent and that he was forced to complete duties assigned to Dejournette. Brownfield also claimed that his supervisor, Merryman, was too friendly with Dejournette, and that Merryman unfairly awarded comp time and preferable assignments to Dejournette rather than to Brownfield. This is the stuff of "internal power struggles within the workplace . . . which is of no interest beyond the employee's bureaucratic niche." *Desrochers*, 572 F.3d at 710 (quotation omitted); *see also Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 319 (9th Cir. 1991) ("These matters are the minutiae of workplace grievances.").

Brownfield cites to several cases in which we have described the bounds of public concern in expansive terms. For example, in *Gillette v. Delmore*, 886 F.2d 1194 (9th Cir. 1989), we held that "the manner in which police and fire fighters performed their duties on a particular occasion" was a matter of public concern because such information could "raise questions concerning whether persons should be taken to the hospital against their will, what notice they should receive, and what degree of force is appropriate." *Id.* at 1197, 1198. Similarly, in *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992), we concluded that the "incompetence of public law enforcement officials at Juvenile Hall" was a matter of public concern. *Id.* at 1137; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) ("[A]n opinion about the preparedness of a vital public-safety institution . . . goes to the core of what constitutes speech on matters of public concern."); *Allen v. Scribner*, 812 F.2d 426, 431 (9th Cir. 1987) ("[T]he competency of . . . management as well as the efficient performance of [government] duties" are matters of public concern); *McKinley*, 705 F.2d at 1114 ("[T]he competency

of [a] police force is surely a matter of great public concern.").

Although we acknowledged this "broad language" in *Desrochers*, we clarified "that a simple reference to government functioning" does not "automatically qualif[y] as speech on a matter of public concern." 572 F.3d at 711; *see also Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988) ("We do not necessarily suggest that all speech concerning public monies or government inefficiency automatically deserves protection.") *overruled in part by Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To the contrary, "the content of the communication must be of broader societal concern. The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997).

Brownfield's communications regarding Dejournette and Merryman fail this test. Nothing in the statements at issue would be of even modest relevance to the public in evaluating the functioning of the YPD. They simply concern the allocation of work between Brownfield and his partner in running a PAL facility. *Cf. Gilbrook*, 177 F.3d at 866 (statements calling into question a "fire department's ability to respond effectively to life-threatening emergencies" addressed a matter of public concern); *Hyland*, 972 F.2d at 1138 (communications were public rather than personal in part because they "did not concern [plaintiff's] dissatisfaction with his own position or on-the-job treatment"); *Gillette*, 886 F.2d at 1196, 1198 (fireman's complaints regarding police use of excessive force addressed a matter of public concern). Brownfield frames his complaints as uncovering "irregularities" in PAL bank accounts, but his characterization is inconsistent with the record. At worst, Brownfield's communications show that a PAL check bounced due to Dejournette's failure to transfer funds from a sub-account. However, Brownfield did not claim

that Dejournette had committed any type of malfeasance, and the overdraft charge was refunded.[3]

We also acknowledge the context of Brownfield's speech: He complained only to his superiors concerning individuals with whom he shared duties or who supervised him. *Cf. Gilbrook*, 177 F.3d at 866 (plaintiff made statements to the press); *Allen*, 812 F.2d at 431 (communications at issue made to public); *McKinley*, 705 F.2d at 1115 ("[P]laintiff's speech was specifically and purposefully directed to the public . . . ."). "In a close case, . . . the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Desrochers*, 572 F.3d at 710 (quotation omitted); *see also Gilbrook*, 177 F.3d at 866 ("An employee's motivation and the audience chosen for the speech also are relevant to the public-concern inquiry.").

**[10]** Looking to the "content, form, and context of" Brownfield's complaints, *Connick*, 461 U.S. at 147-48, we agree with the district court that the speech addressed matters of personal rather than public concern, *see Desrochers*, 572 F.3d at 709. Accordingly, the speech was not protected, and summary judgment in favor of the City was proper.

## C

Finally, Brownfield argues that the district court erred in dismissing his FMLA claim. Under FMLA regulations, "[n]o second or third opinions on a fitness-for-duty certification may be required." 29 C.F.R. § 825.312(b). Brownfield contends the City violated this provision by requiring him to sub-

---

[3]After he was found to be unfit for duty, and just after he received a pre-termination notice, Brownfield alleged that Dejournette may have stolen funds from PAL. Because of the timing of the allegation, however, it could not have prompted YPD's actions.

mit to an FFDE after his primary care physician, Dr. Gondo, allegedly cleared Brownfield for duty. We disagree. No reasonable juror could misread Dr. Gondo's letter as stating that Brownfield had recovered from the psychological issues that rendered him unfit for duty. Dr. Gondo's transmittal refers to the relatively minor injuries Brownfield suffered in a December 2005 car accident and states that "the injured worker can perform the physical activities described in the job analysis." Dr. Gondo makes no mention of Brownfield's psychological issues.

**[11]** After the City received Dr. Gondo's letter, it requested that he defer to Dr. Decker's diagnosis or state his psychological credentials and basis for disagreement. Although Dr. Gondo responded that he would not acquiesce, he did not purport to pass on Brownfield's psychological problems. Rather than insisting on a "second or third opinion," 29 C.F.R. § 825.312(b), the City's referrals of Brownfield to Drs. Mar and Ekemo after Dr. Decker found him permanently unfit for duty simply provided Brownfield additional opportunities to obtain a proper clearance. The FMLA does not impose liability for such conduct.

Brownfield also asserts a claim for FMLA retaliation premised upon his theory that Dr. Gondo certified him for return from FMLA leave. Because we reject this theory, it follows that his retaliation claim lacks merit.[4]

---

[4]Brownfield argues in passing that the City also violated the FMLA by transmitting Dr. Decker's report to Dr. Gondo. He asserts that this was a "prima facie violation of the FMLA," but does not explain how this violation harmed him. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (FMLA's non-disclosure provision "provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost by reason of the violation"). In any event, we decline to address this argument because it was inadequately briefed. "We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (citations omitted).

## III

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.