RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0195p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

EMILY C. KROLL,

*Plaintiff-Appellant,*

No. 13-1774

*v.*

WHITE LAKE AMBULANCE AUTHORITY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-00626—Gordon J. Quist, District Judge.

Argued: June 24, 2014

Decided and Filed: August 19, 2014

Before: MOORE, SUTTON, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellant. Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellee. **ON BRIEF:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellant. Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. While Emily Kroll was an emergency medical technician ("EMT") for White Lake Ambulance Authority ("WLAA"), she began a tumultuous affair with her married coworker. As the relationship unraveled, Kroll became increasingly emotional at work. After Kroll had a personal altercation with one of her

1

coworkers, her supervisor expressed concern regarding her "immoral" sexual conduct and demanded that she undergo psychological counseling. When Kroll refused, she was fired. Kroll claims that WLAA violated the Americans with Disabilities Act ("ADA") by requiring a medical examination that was not "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). In a previous appeal, we held that the district court erred in granting summary judgment in favor of WLAA because Kroll had presented sufficient evidence genuinely to dispute whether the counseling WLAA required of her was a "medical examination." *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809 (6th Cir. 2012) ("*Kroll I*"). On remand, the district court again granted summary judgment in favor of WLAA. Because we find evidence in the record to establish a genuine factual dispute as to whether the required counseling was "job-related and consistent with business necessity," we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

In September 2003, White Lake Ambulance Authority hired Emily Kroll as an EMT. EMTs are responsible for responding to emergency calls, providing basic medical care, and safely transporting patients to the hospital. Kroll's coworkers uniformly described her as a "good" EMT who followed protocol, appropriately cared for patients, and maintained positive working relationships with the other EMTs. R. 53-3 (Holmstrom Dep. at 4) (Page ID #514); R. 54-2 (Terpstra Dep. at 38) (Page ID #541); R. 53-5 (Osborn Dep. at 9–10) (Page ID #529–30). In the nearly five years she was employed by WLAA, Kroll never faced any formal disciplinary action for a rules violation. R. 52-4 (Binns Dep. at 58–59) (Page ID #486).

In 2007, Kroll began an affair with Joshua Easton, her married coworker. Their relationship, which lasted for several months, was "rocky" and punctuated by frequent arguments. R. 50-6 (Easton Dep. at 11–12) (Page ID #281–82). Kroll's personal conflicts with Easton began to affect her behavior at work. Easton claims that Kroll frequently sent him text messages and e-mails and screamed at him over the phone while he was working. *Id.* at 14, 16 (Page ID #284–85). Several of Kroll's coworkers witnessed other incidents that made them question Kroll's emotional stability. On one occasion, Amy Callison found Kroll crying in a parking lot, R. 50-11 (Callison Dep. at 14) (Page ID #333), and on another occasion, Kroll called

Jean Dresen, the WLAA office manager, in tears after finishing a shift. R. 50-12 (Dresen Dep. at 23) (Page ID #340). In addition, other coworkers claim to have observed Kroll arguing with Easton on her cell phone or sending text messages while she operated an ambulance. R. 50-9 (Terpstra Dep. at 32, 40) (Page ID #324–25); R. 50-5 (Osborn Dep. at 28–29) (Page ID #273–74).

Brian Binns, the Director of WLAA during the period of Kroll's employment, prohibited employees from using their cell phones for any purpose while driving a vehicle owned by WLAA. R. 52-4 (Binns Dep. at 51–52) (Page ID #484). Kroll's coworkers testified that they reported to both Binns and Dresen that Kroll frequently used her cell phone while operating the ambulance. R. 50-5 (Osborn Dep. at 29–30) (Page ID #274–75); R. 50-9 (Terpstra Dep. at 27, 32) (Page ID #322, 324). However, Kroll denies ever having used her cell phone while driving an ambulance for WLAA. R. 50-7 (Kroll Dep. at 134) (Page ID #294); *see also* R. 50-14 (Sturgis Dep. at 27–28) (Page ID #357–58). At the time of his deposition, Binns could recall only one complaint about Kroll using her phone while driving. R. 52-4 (Binns Dep. at 53, 61–64) (Page ID #484, 486–87).

In mid-April 2008, Binns and Dresen discussed their concerns regarding Kroll's behavior, and Binns directed Dresen to identify a mental-health professional who could help Kroll. R. 50-12 (Dresen Dep. at 35–36) (Page ID #345–46). Dresen spoke to Kroll about Binns's desire that she seek counseling for her mental-health issues. Dresen informed Kroll that WLAA would not pay for therapy but offered to assist in finding a counselor. Dresen also asked Kroll to sign a release permitting WLAA to monitor whether she was attending counseling. *Id.* at 35–36, 39–40 (Page ID #345–48). Kroll did not seek counseling at that time.

On April 28, Kroll and Jodi Osborn, a paramedic, worked together on an ambulance run. There was personal animosity between the two women: Before the run, Kroll had inadvertently forwarded a message, which she had originally intended for Easton, to Osborn. In the message, Kroll asked Easton whether he was involved in a sexual relationship with Osborn. R. 50-16 (Email) (Page ID #368). During the ambulance run, Osborn and Kroll argued about the e-mail. Osborn called Kroll a "whore" who was "only good for getting down on [her] knees." R. 50-7 (Kroll Dep. at 167) (Page ID #303). When Kroll and Osborn began to treat the patient, Osborn

asked Kroll to assist her in administering oxygen, but Kroll ignored the request. After the run, Osborn complained to Binns that Kroll had refused to communicate regarding the patient's care. R. 50-5 (Osborn Dep. at 35–36) (Page ID #277–78).

Binns met with Kroll and her father later that day to discuss Binns's concerns about Kroll's behavior. Binns told Kroll that she could continue her employment with WLAA only if she agreed to undergo counseling. R. 53-3 (Holmstrom Dep. at 10–11) (Page ID #515). Binns admitted during his deposition that he "never had a problem with [Kroll] as far as patient care." R. 52-4 (Binns Dep. at 66) (Page ID #488). Rather, he decided to compel counseling because Kroll's "life was a mess and [h]e thought [h]e could help her." *Id.* He also explained that his primary concerns regarding Kroll related to her personal life and her sexual relationships. *Id.* at 68–69 (Page ID #488). Kroll confirmed that Binns told her she would need to attend counseling because of her personal behavior. She testified that, during the meeting following her argument with Osborn, Binns "said I was picking up men from the bar and I was going to end up raped if I just picked up random men from the bar." R. 53-4 (Kroll Dep. at 173) (Page ID #523). Kroll recalls that Binns explicitly told her that she "needed counseling because of [her] immoral personal behavior." *Id.* at 175 (Page ID #523).[1] Neither Binns nor Dresen consulted with a psychologist or other mental-health professional before deciding to force Kroll into counseling. R. 53-1 (Dresen Dep. at 173) (Page ID #500). Although Kroll agreed that she had some emotional problems and that she might have benefitted from some counseling, she refused treatment because she could not afford to pay for it. R. 50-7 (Kroll Dep. at 178) (Page ID #307). Kroll turned in her WLAA equipment, and she was not scheduled for any additional shifts. *Id.*

On July 9, 2009, Kroll filed a complaint alleging that WLAA violated the Americans with Disabilities Act, 42 U.S.C. § 12112(d)(4)(A), by requiring her to submit to a medical examination that was not "shown to be job-related and consistent with business necessity." R. 1 (Compl.) (Page ID #1–8). After discovery, WLAA filed a motion for summary judgment, asserting that the requirement that Kroll attend counseling did not violate the ADA because it

---

[1]This was not the first time that Binns had required an employee to seek counseling after he learned that the employee was involved in an extramarital sexual relationship. In the mid-1980s, Binns required Jeff Holmstrom to undergo counseling because he was a "skirt chaser" who dated married women. R. 52-4 (Binns Dep. at 41–42) (Page ID #482–83). And in 1993, Binns required Kathie Sturgis to attend counseling when he learned that she was dating a married man. R. 54-1 (Sturgis Dep. at 13–14) (Page ID #536–57).

was job-related and consistent with business necessity. The district court granted WLAA's motion for summary judgment on alternative grounds, concluding that it "need not determine whether WLAA had a reasonable basis to justify its demand that Kroll attend counseling because, contrary to Kroll's claim, counseling alone does not constitute a medical examination under the ADA." *Kroll v. White Lake Ambulance Auth.*, No. 1:09-CV-626, 2010 WL 3273057, at *4 (W.D. Mich. Aug. 19, 2010). On Kroll's appeal, we reversed the grant of summary judgment, holding that "Kroll has presented sufficient evidence such that a reasonable jury could conclude that the 'psychological counseling' Kroll was instructed to attend did constitute a 'medical examination' under the ADA." *Kroll I*, 691 F.3d at 820.

On remand, WLAA renewed its motion for summary judgment on the basis that, even if counseling is a "medical examination," it was permissible under the ADA to require the examination because Kroll's behavior was negatively affecting her job performance. The district court again granted summary judgment in favor of WLAA, concluding that "Binns's requirement that Kroll obtain psychological counseling was both job-related and consistent with WLAA's business necessity." *Kroll v. White Lake Ambulance Auth.*, No. 1:09-CV-626, 2013 WL 2253757, at *5 (W.D. Mich. May 22, 2013). The district court reasoned that, based on the concerns that Kroll's coworkers expressed to Dresen and Binns regarding Kroll's emotional health, "Binns had ample evidence that Kroll's emotional issues were compromising her ability to perform her job duties in a competent and safe manner." *Id.* The district court also concluded on the basis of the same evidence that Kroll posed a "direct threat" to her own safety and the safety of others because of the potential danger arising from her unsafe driving. *Id.* Kroll timely appealed the district court's grant of summary judgment in favor of WLAA.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1093 (6th Cir. 1998). Summary judgment is proper when the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court must view all evidence and draw any reasonable inferences therefrom in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. ANALYSIS

The Americans with Disabilities Act prohibits an employer from "requir[ing] a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Because we have already determined that Kroll has presented sufficient evidence to withstand summary judgment regarding whether psychological counseling is a "medical examination," the issue in this appeal is whether the counseling is job-related and consistent with business necessity.

The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). The business-necessity standard cannot be satisfied by an employer's bare assertion that a medical examination was merely convenient or expedient. *See Conroy v. New York Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003). Rather, the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business. *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12 (6th Cir. 2012); *see also Pence v. Tenneco Auto. Operating Co.*, 169 F. App'x 808, 812 (4th Cir. 2006) ("[W]e note that whether a mental examination was job-related and consistent with business necessity is an objective inquiry.") (internal quotation marks omitted).

A reasonable jury could conclude that Binns, who was the Director of WLAA during the time of Kroll's employment, decided that Kroll needed to receive counseling as a condition of employment. Although Binns discussed the matter with Dresen, the office manager, and asked that Dresen coordinate the logistics and communicate his decision to Kroll, R. 50-12 (Dresen Dep. at 35) (Page ID #345), it was Binns who ultimately decided that counseling was necessary and instructed that Dresen should call an administrator at WLAA's external workplace-health

office to settle the details. *Id.* at 36 (Page ID #346). Thus, the decision to require a medical examination was justified only if it was reasonably based on objective evidence known to Binns.

Kroll has provided evidence from which a jury could reasonably infer that Binns had only limited information pertaining to her alleged emotional outbursts and disregard of safety rules. First, the record indicates that Binns knew of only one incident during the entire period of Kroll's employment when she provided substandard patient care. Kroll does not dispute that Osborne reported to Binns that Kroll had refused to administer oxygen to a patient during their ambulance run. Indeed, it was Osborne's complaint that prompted Binns to call Kroll for a meeting and require her to submit to counseling. However, Binns was not under the impression that Kroll routinely provided inadequate care to patients: he admitted that he "never had a problem with [Kroll] as far as patient care," R. 52-4 (Binns Dep. at 66) (Page ID #488), and it is undisputed that Kroll had never before been formally disciplined for any reason. R. 53-4 (Kroll Dep. at 25) (Page ID #519); R. 52-4 (Binns Dep. at 58–59) (Page ID #486). Second, a reasonable jury could infer that Binns knew of only one incident of Kroll using her cell phone while operating an ambulance. Although several of Kroll's coworkers claim that they reported to Binns on more than one occasion that Kroll was using her cell phone to text and call while driving WLAA ambulances,[2] Binns testified that he could recall only one employee reporting that Kroll was using her cell phone while driving. R. 52-4 (Binns Dep. at 61–64) (Page ID #486–87). We must therefore determine whether Binns's knowledge of these two incidents provided sufficient objective evidence upon which he could determine that a medical examination was job-related and consistent with business necessity.

---

[2]Kroll flatly denies that she ever used her cell phone while operating an ambulance. R. 50-7 (Kroll Dep. at 134) (Page ID #294). Her denial is lent some support by another former WLAA employee who recalled that Kroll told her in a private conversation before Kroll initiated this lawsuit that she had never used her cell phone to make a call or text message while driving. R. 50-14 (Sturgis Dep. at 27–28) (Page ID #357–58). Even assuming that Kroll did not ever use her cell phone while operating an ambulance—as we must, at this stage of the litigation—the fact remains that Binns was aware of at least one report that she had done so. R. 52-4 (Binns Dep. at 61–64) (Page ID #486–87); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (concluding that a medical examination was reasonable because a supervisor could rely on the reports of multiple coworkers regarding an employee's withdrawn and depressed behavior). Because the relevant inquiry is whether the decision maker had objective evidence upon which to base his decision to compel a medical examination, *see Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999), it is immaterial whether or not Kroll did actually use her cell phone while driving.

It is undisputed that Kroll did not request psychological counseling or any other form of medical accommodation from WLAA. Thus, the counseling required by WLAA can be justified only if Binns had a reasonable basis for believing that Kroll was unable to perform the essential functions of her job, *see Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999), or that she posed a direct threat to her own safety or the safety of others, s*ee Prevo's Family Mkt.*, 135 F.3d at 1095.

## A.  Impairment of Essential Job Functions

An employer may request a medical examination when "there [is] significant evidence that could cause a reasonable person to inquire as to whether [the] employee is still capable of performing [her] job." *Sullivan*, 197 F.3d at 811. "An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.'" *Id.* (quoting 42 U.S.C. § 12112(d)(4)(B)). Such a genuine reason may arise when an employee's "aberrant behavior" raises the concern that an employee's mental or emotional instability could undermine her ability to complete her job functions effectively in the employer's work environment. *Id.* at 812; *see also Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311–12 (11th Cir. 2013) (concluding that an examination was "job-related" because it assessed "an employee's ability to handle reasonably necessary stress . . . [which is an] essential function[] of any position") (internal quotation marks omitted).

The record contains ample evidence that Kroll began displaying aberrant emotional behavior after she became embroiled in a relationship with Easton: a coworker observed her crying in a grocery store parking lot, R. 50-11 (Callison Dep. at 15–16) (Page ID #334–35); she called a coworker in tears one night after her shift, R. 50-12 (Dresen Dep. at 23) (Page ID #340); and a coworker saw her crying and arguing with Easton in the hallway at WLAA, R. 50-8 (Betka Dep. at 13, 15) (Page ID #313, 315). However, Kroll's behavior is relevant to the assessment of whether she was capable of performing her job only to the extent that it interfered with her ability to administer basic medical care and safely transport patients to the hospital. A reasonable jury could find that Kroll's emotional outbursts outside of work hours and not in the presence of patients did not impair her ability to perform essential job functions. Moreover, as

discussed above, her behavior may provide a basis for compelling a medical examination only to the extent that Binns was aware of it. Thus, at most, the record reveals only two incidents that could support a determination that Kroll's behavior may have undermined her ability to perform the essential functions of her job: (1) a single incident of using her cell phone while driving an ambulance; and (2) a single incident of refusing to administer oxygen to a patient.

Based on this information, a reasonable jury could find that Binns could not reasonably have concluded that Kroll was unable to perform the essential functions of her job. Safely transporting patients to the hospital and providing basic medical care were among the essential duties of Kroll's position as an EMT. Binns knew that an EMT who becomes distracted while driving an ambulance, either because she is using her cell phone or because she is focused on personal concerns, is at a higher risk of causing a traffic accident. *See* R. 52-4 (Binns Dep. at 51–52) (Page ID #484). Therefore, had Binns been aware of a pattern of behavior that showed Kroll's emotional or psychological problems were interfering with her ability to drive an ambulance safely, he might have been justified in ordering a medical examination. In the instant case, however, Binns knew only that Kroll had broken a safety rule once and provided suboptimal care to a patient once. Kroll's isolated moments of unprofessional conduct might reasonably have prompted Binns to begin internal disciplinary procedures or to provide Kroll with additional training, but they could not support the conclusion that Kroll was experiencing an emotional or psychological problem that interfered with her ability to perform her job functions. Thus, drawing all reasonable inferences in Kroll's favor, we conclude that a reasonable jury could determine that Binns did not have sufficient objective knowledge upon which to base a decision that Kroll's job performance was impaired.

## B. Direct Threat

An employee poses a "direct threat" when she creates "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also Prevo's Family Mkt.*, 135 F.3d at 1095. An assessment of whether an employee poses a direct threat must be "individualized" to the employee's abilities and job functions and "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). In determining whether a direct threat

exists, the court should consider:  "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm."  *Id.*

Our sister circuits have recognized that "special circumstances" may exist in workplaces where employees respond to stressful situations and shoulder responsibility for public safety. *Conroy*, 333 F.3d at 99 (correctional facility); *see also Brownfield v. City of Yakima*, 612 F.3d 1140, 1146–47 (9th Cir. 2010) (police department); *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (fire department); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (juvenile unit of police department); *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (police department).  In these "public safety" workplaces, an employer may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces because employees are "in positions where they can do tremendous harm if they act irrationally," and thus they pose a greater threat to themselves and others.  *Watson*, 177 F.3d at 935.  However, even in public safety workplaces, a small number of isolated incidents of troubling behavior may not be sufficient to establish that a psychological examination is a business necessity.  *See Brownfield*, 612 F.3d at 1146 ("Although a minor argument with a coworker or isolated instances of lost temper would likely fall short of establishing business necessity, Brownfield's repeated volatile responses are of a different character.").

As an EMT employed by an ambulance service, Kroll was undoubtedly employed in a position of public safety.  A reasonable jury could find that the emotional behavior observed by Kroll's coworkers, particularly any distractions while Kroll was driving, could endanger not only herself and her coworkers but also the members of the public she was called upon to aid.  Thus, if Binns had been aware of a pattern of conduct in which Kroll succumbed to emotional outbursts while she was driving or providing direct medical care, he might have been justified in concluding that she posed a direct threat to safety.  However, as discussed above, Binns knew of only two isolated incidents when Kroll ever behaved in a way that could endanger another person.  A reasonable jury could find that Binns could not reasonably have concluded from these missteps that Kroll presented "a significant risk to the health or safety of others."  42 U.S.C. § 12111(3).

Moreover, even if Kroll did pose a safety risk, a reasonable jury could find that Binns was not justified in ordering her to submit to a medical examination because he did not make his decision "based on a reasonable medical judgment." 29 C.F.R. § 1630.2(r). We have not yet determined what precisely this regulation requires an employer to do: It could direct an employer to consult with a medical professional, to survey relevant medical literature, to take stock of common knowledge regarding well-known medical conditions, or to take some other action that evidences reliance on medical knowledge. *See Prevo's Family Mkt.*, 135 F.3d at 1095 (suggesting that the danger of HIV transmission through contact with blood was so well-known that it was unnecessary to consult a medical professional to determine if an examination was necessary); *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 403–06 (6th Cir. 1998) (finding a compelled medical examination permissible when the decision was based on consultation with physicians and a Centers for Disease Control report). For the regulation to have any meaning, however, an employer must do more than follow its own lay intuition regarding the threat posed by an employee's potential medical condition.

We need not decide in this case how an employer may demonstrate that its decision to require an examination was based on medical judgment because there is no evidence in the record that Binns made any kind of medical judgment at all. R. 53-1 (Dresen Dep. at 56–59) (Page ID #503–04) (admitting that WLAA did not consult with any mental-health professional). Indeed, the only record evidence relating to Binns's decision-making process strongly suggests that he made his decision based on moral convictions rather than medical concerns: Binns admitted that he ordered Kroll to attend counseling because he had "concerns" about her "sexual relationships with men" and that he thought that "her life was a mess and [h]e could help her." R. 52-4 (Binns Dep. at 66, 68–69) (Page ID #488). This open admission that an employer ordered a medical examination based on moralistic condemnation of an employee's private behavior is troubling, to say the very least. A jury could easily conclude from Binns's own testimony that he did not base a conclusion that Kroll posed a direct threat on a "reasonable medical judgment." 29 C.F.R. § 1630.2(r).

A jury drawing all reasonable inferences in Kroll's favor could reasonably determine that Binns lacked sufficient objective evidence to conclude that Kroll was impaired in the

performance of her essential job functions or that she posed a direct threat to the safety of others. Accordingly, there remains a genuine dispute of material fact regarding whether the psychological counseling ordered by WLAA was "job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4)(A), and WLAA was not entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.