BROWN, Circuit Judge,
dissenting:
This is an unusual case — one in which the court’s interpretation of the Whistle-blower Protection Act, D.C.Code §§ 1-615 et seq. (‘WPA”) makes a virtue of insubordination; where the existence of putative protected disclosures means defiance is a complete defense — or at least a justification for a jury trial.
I reluctantly agree with my colleagues that Coleman’s self-serving defenses to the discipline initiated by the Fire Department included, among much finger-pointing and disclaiming of responsibility, some complaints that might qualify as protected disclosures under the WPA. I also agree the WPA requires a defendant to meet a stringent standard when retaliation is alleged, and that a district court cannot compensate for inadequacies in the defense’s case by drawing its own inferences as to the legitimacy of the employment actions taken. Here, the employer marshalled a mountain of evidence supporting the legitimate, non-retaliatory reasons for its employment decision; but, because defense counsel failed to recognize that Coleman’s blame-shifting criticisms might fall within the broad ambit of protected disclosures, the summary judgment motion was not as strong as it might have been. However, as the court notes, the Department did articulate legitimate, non-retaliatory rationales for referring Coleman for a fitness evaluation. See Mot. for Summ. J. at 2-16, 26-29, 36-37, Coleman v. District of Columbia, No. 1:09-cv-50 (RCL) (Aug. 8, 2012), ECF No. 131. And the district court considered the Department’s reasons. See J.A. 113 (“[Coleman’s] filings, as well as [her] other behavior, gave the defendants legitimate concern about her mental state, and her ability to safely command her company.”) (emphasis added). Given Coleman’s anemic and largely irrelevant rebuttal, no reasonable jury could have concluded the Department’s purpose or motive was retaliatory. The Department’s reasons for ordering the fitness evaluation hold up even under the WPA’s clear and convincing standard.
To begin at the beginning, Coleman went to work for the D.C. Fire and Emergency Medical Services Department (“FEMS” or “the Department”) right out of high school. By December 2007 she was a captain in charge of an engine company.
In March 2008, a devastating fire erupted in a high rise apartment building in Washington’s Mount Pleasant neighborhood. Under FEMS Standard Operating Guidelines, the first company to arrive at a fire scene is responsible for checking the building’s basement, and Coleman’s company was the first to arrive. That fire, one of the largest in the D.C. Fire Department’s recent history, was badly managed. The apartment building was totally destroyed and a nearby church was badly damaged. An initial investigation indicated that miscommunications contributed to the bad outcome. Battalion Fire Chief John Lee, who was in charge of the fire scene, radioed Captain Coleman for a “basement report.” Coleman told him her company was on the second floor. The basement check, which had been Captain Coleman’s initial responsibility, was never completed. Coleman’s excuse was that BFC Lee had ordered her to the third floor of the buñding. Lee acknowledged that he gave the order and did not confirm that the basement check had been completed. Coleman followed his orders with alacrity but did not inform Lee or Command this crucial task had been neglected. It was Coleman’s obligation to inform com *68 mand of her inability to effectively carry out an order. Subsequent analysis of the fire suggested the omission may have fatally undermined the Department’s efforts to control the fire since it apparently started in the basement. BFC Lee and Captain Coleman each placed blame at the other’s feet; both were charged with a violation of fire protocols. John Lee accepted the proposed discipline and was reprimanded. Coleman refused to accept any responsibility, challenged the decision, and ultimately received a suspension. Coleman’s claim to whistleblower protection arises out of her efforts to escape criticism for the Mount Pleasant debacle.
Coleman instigated a near-obsessive campaign for absolution. This campaign involved a barrage of e-mails to her immediate supervisors and beyond, the circulation of a blog post entitled Vanessa Coleman’s Job Crisis Journal, a radio interview, a letter to the mayor and two D.C. councilmembers, an EEO complaint, and finally a refusal to submit to a fitness evaluation she had been ordered to undergo. Coleman’s fixation with clearing herself of wrongdoing culminated in the filing of this lawsuit, alleging the request for a fitness evaluation was an act of retaliation by the Department. Not surprisingly, the district court concluded the Department had articulated legitimate, non-retaliatory reasons for its actions. First, the court concluded the Department “reprimanded [Coleman] for making an error at the scene of the fire because they found she actually made such an error.” J.A. 104 (emphasis in original). Moreover, the court noted once defendants offered a legitimate, non-retaliatory reason for taking action, a plaintiffs inability to show the proffered reasons are mere pretext is fatal. The court held that “[b]y repeating and documenting her long trail of filings and memoranda, [Coleman] has inadvertently provided documentary support for defendant’s legitimate reason for taking action against her.” J.A. 114.
As the district court noted, once the employer asserts a legitimate, non-diserim-inatory reason for the challenged action, see Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C.Cir.2008), the court’s task is to review all the evidence to determine a single question: whether the evidence “either separately or in combination provides sufficient evidence for a reasonable jury to infer retaliation.” Jones v. Bernanke, 557 F.3d 670, 679 (D.C.Cir. 2009); see also Crawford v. District of Columbia, 891 A.2d 216, 221 n. 12 (D.C. 2006) (adopting the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting paradigm for WPA cases). The only reason the prima facie case is important here is because defendants, confident that Coleman’s self-serving litany of excuses could not be deemed protected disclosures, relied more heavily on the plaintiffs procedural deficiencies than on the Department’s abundance of supporting facts.
The confusion is understandable. Ordinarily, a protected disclosure precedes and arguably leads to the adverse employment action and thus the inference of retaliation. Here, in contrast, Captain Coleman was already in the midst of a disciplinary procedure when she raised the disclosures at issue as a defense. She then claimed subsequent employment actions — the ordered fitness evaluation and the termination that resulted from her adamant refusal to follow orders — were retaliatory. But, these actions rise and fall together. If the initial order for a fitness for duty assessment was not retaliatory, the many additional opportunities to comply cannot be faulted.
Assistant Chief Brian Lee’s intuition that all might not be well with Coleman was not, as the court contends, cherry *69 picking a few words out of context. Maj. Op. at 63. Paranoia was the leitmotif of Coleman’s communications during this period. Coleman purported to “cite” a superior claiming he had “orchestrated a behavior of mutiny.” J.A. 272. She referred to a “conspiracy” against her, J.A. 272, and compared herself to a victim of “concealed acts of friendly fire” during “combat,” J.A. 249a, 253. She wrote that her superiors were engaged in a “pursuit” to “diabolically cripple [her] professional career,” and, if quick action were not taken to correct “such violent, misuse of authority,” the “entire [Fire Department] will lie in irreversible peril,” J.A. 246, 248. In another communication, Coleman stated: “If a man is facing execution, at a certain time and certain place, it is his civic right to be explained the charge for which he is being executed for. It’s too late to remit explanation after the man is dead — having already been executed.” J.A. 249a. Coleman sometimes made these communications in a manic fashion; she wrote, for example, six memoranda to the Fire Chief in a single day. And Assistant Chief Brian Lee had other indications that Coleman’s mental state might be deteriorating. While talking to Coleman, Lee noticed that she raised the same issues repeatedly and sounded “frantic,” “disjointed,” and even a “little incoherent.” J.A. 893, 915-16. Given these curious communications, any supervisor worth their salt would question whether an employee was fit for duty.
The Department also offered other reasons for ordering the evaluation. In his affidavit, Brian Lee cited as the most significant sign of erratic behavior that “Coleman’s continually disregarded orders and the chain of command, [and] repeatedly placed her subordinates and superiors on numerous charges.... ” J.A. 457. Indeed, he asked for “immediate help” in ordering a fitness for duty evaluation precisely because Coleman had violated “the chain of command” and her reports had become “more alarming.” J.A. 288. Significantly, Lee asked for assistance in ordering the evaluation a full week before Coleman’s July 23rd protected disclosure — robust proof that Lee did not order the evaluation for retaliatory purposes.
The different attitude displayed by Lee and Coleman toward firehouse culture is illuminating. Lee continually stressed the importance of obeying orders. He described the Department as a “paramilitary organization” and stressed the impropriety of willfully disobeying orders. Because being willing to follow orders is part of the contract to which every member of a fire department agrees when they accept the job, he found Coleman’s objection that she had not consented to the fitness exam incomprehensible. In an organization where following orders is essential to function, following orders cannot be inconsistent with consent. Coleman, in contrast, refused to follow orders with which she disagreed. In 2006 Coleman alleged she was the victim of gender discrimination. After an exhaustive investigation, no probable cause was found to support her complaint, but a review of previous complaints revealed “that every time Captain Coleman was subject to personal discipline or something she did not like, she alleged discrimination.” J.A. 459, Aff. of Detria Liles Hutchinson. Soon after Coleman was promoted to captain she was informed that several discrimination complaints had been made against her. Coleman refused to meet with the head of FEMS’s Women’s Advisory Committee; when the manager of the EEO Program, Detria Hutchinson, went to the Firehouse to talk with her, Coleman refused to meet with her; and when that refusal led to an order to attend an EEO for Managers class Coleman refused to comply, first claiming she had a *70 flat tire and then refusing to go because she claimed the class was “punitive.” Coleman subsequently filed charges against Hutchinson for recommending she attend the EEO for Managers class. Hutchinson concluded: “Captain Coleman believes ... she is above such training.” J.A. 462.
The only time Coleman insisted that orders must be followed is when she believed that requirement excused her actions at the Mount Pleasant fire. The Trial Board’s consideration of the charges of the insubordination that resulted from refusing the fitness exam confirmed this pattern. After a comprehensive review- of Captain Coleman’s personnel record, the Board noted a “particularly alarming” finding: Captain Coleman frequently had conflicts with superior officers and subordinates throughout her career.
Coleman’s repeated refusals to submit to a fitness evaluation — a clear case of insubordination in a department as hierarchical as FEMS — provided another sufficient alternative explanation for her termination. See Johnson v. District of Columbia, 935 A.2d 1113, 1118 (D.C. 2007) (“Even assuming that the appellants had proffered [a prima facie case], the summary judgment motion would have been meritorious nonetheless if [plaintiff] could not counter the [defendant’s] explanation that [plaintiff] would have been suspended anyway, for an unrelated, legitimate reason.”). Lee’s explanation is all the more persuasive since Coleman identifies no specific disclosure for which the Department sought to retaliate. Finally, Lee explained that if Coleman was found fit for duty after the evaluation, she would be returned “to commanding a frontline company,” suggesting the evaluation was ordered for safety reasons, not as retaliation for any protected disclosure. J.A. 457-58.
In the face of overwhelming proof that Lee ordered a fitness evaluation to assess whether Coleman was a danger to herself, the -public, or other firefighters, the court claims Coleman’s meager cache of contrary evidence rebuts the Department’s proffered rationale. A psychologist with significant experience in conducting fitness-for-duty examinations reviewed the communications at issue and concluded that there was no “logical, psychological or medical basis” for ordering the evaluation. J.A. 579. The court claims that, to the extent the “validity of the Department’s rationale turns on whether its explanation is credited over that of Coleman’s expert,” such a “credibility judgment is for a jury to make, not a court at summary judgement.” Maj. Op. at 63.
That is not the law of this circuit. What is occurring is not simply a credibility determination; it is, just as with every request for summary judgment, consideration of the entire record in deciding whether a reasonable jury could conclude that the plaintiff suffered retaliation. See Jones, 557 F.3d at 679 (a court must consider whether the evidence “either separately or in combination provides sufficient evidence for a reasonable jury to infer retaliation”). We have previously noted that not every plaintiff “who creates a genuine issue of material fact” as to pretext “will always be deemed to have presented enough evidence to survive summary judgment.” Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C.Cir.1998) (emphasis in original). We instead made clear that a “court must consider all the evidence in its full context in deciding whether the plaintiff has met [her] burden of showing that a reasonable jury could conclude that [s]he had suffered discrimination and accordingly summary judgment is inappropriate.” Id. Indeed, the Supreme Court has expressly held that an *71 “employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision.” The court dismisses Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), but if the same framework governs discrimination and retaliation cases, then abundant, uncontroverted, independent evidence of an alternative, non-retaliatory explanation for the employer’s action should be dispos-itive no matter what evidentiary standard applies. If, as the court here seems to hold, overcoming summary judgment merely required an opposing evaluation from a plaintiffs expert — thus creating only a weak issue of fact on whether the employer’s reason was untrue — then summary judgment could never serve the role of weeding out cases with insufficient proof. See Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1249 (D.C.Cir.2011) (“Vatel’s submission thus boils down to the proposition that discrimination plaintiffs should receive jury trials as a matter of course, on the theory that the question whether the defendant was motivated by racial or gender bias is always a question of fact for a jury. But that is not the way the law has developed.”).
More importantly, even if a jury were to credit Coleman’s expert, it would be insufficient to rebut the reasonability of Lee’s belief that if Coleman’s general disobedience to the chain of command, augmented by the tone and volume of her communications, was left unaddressed, it might endanger the public safety. See Brady, 520 F.3d at 496 (“The question is not whether the underlying ... incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying ... incident occurred.”) (emphasis in original); George v. Leavitt, 407 F.3d 405, 415 (D.C.Cir.2005) (“[A]n employer’s action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.”); Fischbach v. District of Columbia Dep’t of Corr., 86 F.3d 1180, 1183 (D.C.Cir.1996) (“Once the employer has articulated a non-discriminatory explanation for its action ... the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.”). In a close case, a plaintiffs expert might create a dispute sufficient to preclude summary judgment. But here the communications on their face created great cause for concern, as did Coleman’s repeated refusal to follow the chain of command; the supervisor began planning for an evaluation before the protected disclosure occurred; and the supervisor explained that if Coleman passed. the fitness-for-duty exam, she would return to active service. Thus, only through the other side of the looking glass has Coleman’s evidence rebutted the Department’s “proffered rationale.” Maj. Op. at 63.
To say Coleman’s rebuttal is weak overstates the case. Although Coleman’s expert indicated he reviewed numerous affidavits and the testimony before the Fire Department Trial Board, his opinion focuses only on the import of Captain Coleman’s comments and neglects entirely the history of conflict, dissension, and disobedience detailed in those documents.[1] More impor *72 tantly, how can an expert’s after-the-fact review of Coleman’s written communications rebut Lee’s contemporaneous observations? Indeed, Dr. Hugonnet, who was hired by Coleman, performed his assessment a year after Brian Lee requested the evaluation. And what relevance does the testimony of Coleman’s subordinates have? See Maj. Op. at 66. Neither was her superior or exercised supervisory authority, and there is no indication either one was privy to Coleman’s conflict-riddled employment history or the numerous disturbing communications between Coleman and her superiors. Thus, Coleman’s evidence is of extremely limited relevance, if any. See DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir.1998). Moreover, these offers of proof attempt to answer the wrong question. That an expert, or Coleman’s coworkers, did not believe Coleman’s conduct justified an evaluation does not answer the question of whether Lee honestly thought an exam was warranted. It is well settled that it is the perception of the decision maker that is relevant. See Vatel, 627 F.3d at 1247. Here, Lee’s assessment was entirely consistent with the record. Coleman was an unrepentant outlaw, who had made a number of disjointed communications, failed to follow any orders or directives that did not suit her, and apparently believed all her co-workers were out to get her. These facts are not disputed.[2] As we have said many times, “[i]f the employer’s stated belief about the underlying facts is reasonable in light of the evidence ... there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.” Brady, 520 F.3d at 495; see also Carney v. American University, 151 F.3d 1090, 1094 (D.C.Cir.1998) (holding that plaintiffs “factual proffer requires too much speculation to create a genuine issue of fact” about [defendant’s] motivations”).
In addition, Lee’s assessment was consistent with that of Dr. Smith-Jeffries, the doctor assigned by the Fire Department to evaluate Coleman. After Dr. Smith-Jef-fries received the request for an examination, the doctor phoned Brian Lee and considered his rationale. Based on the information provided, Dr. Smith-Jeffries had questions about Coleman’s “competency” and “whether there might be some paranoia.” J.A. 513. The questions were troubling enough that, although Dr. Smith-Jeffries did not have sufficient information to conclude Coleman was unfit, she concluded a “full assessment” was warranted. J.A. 513-14. Dr. Hugonnet dismisses this contrary evidence and the court ignores it, but it is the finishing blow to any claim that a reasonable jury could find the testimony of Coleman’s expert or coworkers adequately rebuts the Department’s legitimate reason for ordering the fitness evaluation. See Maj. Op. at 64. Coleman should not be able to parlay her *73 insubordinate refusal to cooperate into proof the Department acted with bad motives.
In the end, the only inference of retaliation here is the temporal proximity between the July 23rd protected disclosure and Lee’s ordering of the fitness-for-duty exam on July 25th. But “an inference of retaliation cannot rest solely on temporal proximity (even if it is established) where the opportunity for retaliation conflicts with the opponent’s explicit evidence of an innocent explanation of the event.” Freeman v. District of Columbia, 60 A.3d 1131, 1145 (D.C.2012). Lee’s innocent explanation for ordering the exam can be found in an email he sent a week before Coleman made the protected disclosure. Lee stated that he needed “some immediate help” in ordering an evaluation because Coleman had broken the “chain of command” and her reports were “becoming more alarming.” J.A. 288. Coleman did nothing to rebut this explanation. No reasonable jury could believe the protected disclosure was a “contributing factor” in Lee ordering Coleman to undergo an evaluation. Crawford, 891 A.2d at 219.
Had the court’s result occurred in another context it would be cause enough for alarm given the many ways it runs counter to our precedents. That it occurred in the context of a fire department makes it doubly distressing. The standard the court adopts will lead supervisors in police and fire departments to hesitate in ordering evaluations for employees working in dangerous jobs (where evaluations are needed most) if the employee claims to have made a protected disclosure. Courts ordinarily defer to supervisors in workplaces where employees must follow orders and respond to stressful situations involving public safety. E.g. Coffman v. Indianapolis Fire Dep’t, 578 F.3d 559, 565 (7th Cir.2009) (fire department); Conroy v. New York State Dep’t of Corr. Servs., 333 F.3d 88, 99-100 (2d Cir.2003) (correctional facility); Brownfield v. City of Yakima, 612 F.3d 1140, 1146-47 (9th Cir.2010) (police department); Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir.2007) (juvenile unit of police department). “In these ‘public safety’ workplaces, an employer may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces because employees are in positions where they can do tremendous harm if they act irrationally, and thus they pose a greater threat to themselves and others.” Kroll v. White Lake Ambulance Auth., 763 F.3d 619, 626 (6th Cir.2014); see also Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir.1999) (“In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity.”). If, on this record, the court finds the clear and convincing standard is still not met, the real consequence is that every evaluation order following any purportedly protected disclosure will precipitate a jury trial. Such a result is not only contrary to our precedent but to the Supreme Court’s as well. See Reeves, 530 U.S. at 148, 120 S.Ct. 2097 (“[A]n employer would be entitled to judgment as a matter of law ... if the plaintiff created only a weak issue of fact as to whether the employer’s reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.”).
The great irony of today’s decision is that the Whistleblower Protection Act was designed to protect those who might “risk their own personal job security for the benefit of the public.” Williams v. District of Columbia, 9 A.3d 484, 490 (D.C.2010). Our decision instead shields Ms. Coleman’s insubordinate conduct and demands a jury trial for a completely under *74 standable and .reasonable order requiring Coleman to undergo an evaluation to see whether she remained fit for duty — an order which itself was likely intended to protect the public safety. I respectfully dissent.

. I agree with the court that the Department’s lawyering could have been better. But the Department did raise Coleman's lengthy history of conflict before the district court. See Mot. for Summ. J. at 2-16, 26-29, 36-37, Coleman v. District of Columbia, No. 1:09-cv-50 (RCL) (Aug. 8, 2012), ECF No. 131. And it did so again on appeal. See Defs. Br. at 40 (raising "legitimate grounds for ordering the evaluation,” which included that Ms. Coleman "was not heeding direction from Assistant Chief Brian Lee or other superiors, re *72 fused to take a required EEO training, and repeatedly attempted to cite her superiors, as well as her subordinates, for discipline. (See supra at 8-13)”); id at 8-13 (describing in detail Coleman's history of conflict, dissension, and disobedience). Furthermore, the record presents this history from many disparate perspectives — all confirming Brian Lee's explanations for ordering the fitness evaluation. J.A. 288, 306. The court ignores this evidence because counsel’s argument is too skeletal. But see Reeves, 530 U.S. at 148, 120 S.Ct. 2097 (”[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer’s decision[].”).

. Contrary to what the court claims, Lee’s justification for ordering the evaluation based on Coleman’s "history of dissension” was .never controverted by Coleman's expert, who addressed only Coleman’s histrionic comments, or by her colleagues’ positive views of her work performance.