Filed 7/30/15  Valdivia v. Southern Cal. Gas Co. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARIA VALDIVIA, | B253834 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC480396) |
| v. | |
| SOUTHERN CALIFORNIA GAS COMPANY, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Affirmed.

Paul Kujawsky, for Plaintiff and Appellant.

Young, Zinn & Bate, Harry A. Zinn and Nima Shivayi, for Defendants and Respondents.

———————————

Plaintiff and appellant Maria Valdivia (Valdivia) appeals a judgment following a grant of summary judgment in favor of defendants and respondents Southern California Gas Co. (SCG), Gregory Gellinck (Gellinck) and Larene Lee Hammer (Hammer) (sometimes collectively referred to as SCG).

We conclude Valdivia failed to raise a triable issue of material fact with respect to any of the seven causes of action that are at issue on appeal. Therefore, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Valdivia began working at SCG as a customer service representative in 2001, and in October 2009 she was promoted to a position as a dispatch specialist. Michael Connors (Connors) was Valdivia's manager from January to June of 2010. In June 2010, Gellinck became Valdivia's supervisor and Hammer became Valdivia's manager.

1. *Valdivia's persistent and unwanted interactions with Connors.*

Beginning in May 2010, Valdivia sent Connors hundreds of emails. She also sent him text messages. By October 2010, she also was calling him. She drove near his home in the Santa Clarita area one day after work; her office was in Chatsworth and she lived in Redlands. Connors tried to distance himself from Valdivia, which she acknowledged. For example, on October 5, 2010, Valdivia emailed Connors, stating, "I tried calling you but you never answer me," and "I will call you later, see if you can talk, or choose to ignore me." On October 18, 2010, she wrote him, "I'm sure you're sick of me by now. I called you Friday but of course you never answer my calls."

In February 2011, Connors told Gellinck that he had become concerned about the excessive contacts he was receiving from Valdivia, including on evenings and weekends.

On February 25, 2011, a Friday, Valdivia went into Connors's office. While Valdivia was in there, Gellinck, her supervisor, directed her to leave Connors alone as Connors had nothing to do with her department. According to Valdivia, Gellinck yelled at her.

2

Later that day, after Gellinck had told Valdivia to leave Connors alone, Valdivia emailed Connors, "You BZ??" He responded, "Yes."

The following Monday, February 28, 2011, Valdivia emailed Connors: "Let me know when you are not busy. I need to tell you something." He responded, "Busy all day."

Later that day, Valdivia invited Connors to go to lunch; he declined.

On March 4, 2011, Valdivia emailed Connors 15 times. On March 21, 2011, Valdivia invited Connors to write her at her personal email address.

2. *Valdivia's internal complaints*.

In 2009, Valdivia and four other employees filed an internal ethics complaint against a trainer, MaryAnn Henson. Valdivia stated that one day during computer training, Henson slapped her hand away from the mouse.

On March 2, 2011, Valdivia made an anonymous call to SCG's ethics help line. This call was motivated by the February 25, 2011, incident in Connors's office. In Valdivia's own words, she made a "pretty general" complaint about Gellinck having yelled at her. SCG investigated and found no wrongdoing.

On March 20, 2011, Valdivia made another call to the ethics help line. Valdivia claimed (1) retaliation by Gellinck and Hammer against the employees who had complained about Henson; (2) at a retirement party, Gellinck stated to Valdivia "Calm down wild woman," which implied that Valdivia was "an office slut"; and (3) whenever Valdivia spoke to Connors, Hammer and Gellinck gave her "dirty looks, as if she is not supposed to speak to Connors."

SCG again investigated and determined that no wrongdoing had occurred. The investigative report concluded: "Accusations of retaliation are without merit. Valdivia has a record of attendance issues and Gellinck is taking appropriate steps to correct those issues with her and the entire department. The main catalyst of the complaint seems to be the incident outside of Connors's office, which is located inside the dispatch area.

3

I believe that it caused her some embarrassment and she saw this as 'retaliation' or inequitable treatment."

In the course of the investigation, various individuals were interviewed, including Connors, Gellinck, Connors's wife, and Valdivia. Connors told the interviewer that Valdivia "has sent him volumes of personal emails over the months and has called him on the weekends. She also drops by his office without invitation and stays even though he is busy. He is bothered by this and wants it to stop. Although he's not given her an explicit directive to stop emailing/texting him, he has told her that he doesn't have time for this. Connors had previously told Gellinck about this. On [February 25] Gellinck saw her in his office and told her to leave. She later asked Connors why he hadn't stuck up for her and he responded that he wasn't going to. The emails have continued. He told Hammer about this and he was beginning to feel stalked by Valdivia. Hammer responded that 'she has that personality.' Connors will send [Human Resources (HRA)] copies of the emails."

Valdivia told the interviewer that she and Connors were "just friends," that she seldom visited him and that she emailed him "on and off."

The ensuing report made the following recommendations: "1. Connors will send Valdivia clear directions to stop emails, phone calls, and texting him immediately. Should she continue, he will notify HRA. HRA will contact Security. (Completed on 3/29/11.) [¶] 2. Connors's office will be relocated. (Completed. He moved to Valencia April 5, 2011.) [¶] 3. By April 11, 2011, Hammer will coach Gellinck to not use 'sarcasm' . . . . (Completed 4/12/11.)"

On March 29, 2011, consistent with the above report, Connors emailed Valdivia: "I will no longer be answering or acknowledging emails, phone calls or texts from you. Do not e-mail, text, or phone me any longer."

4

3. *Subsequent events.*

Although on March 29, 2011, Connors unequivocally requested that Valdivia cease contacting him, Valdivia admittedly continued to contact him by email, text message, phone call, and Facebook.

On April 7, 2011, Valdivia emailed Connors, "Before I decide to leave the Company I would like to speak to you.  Please, I know you sent me that email about never contacting [you].  I just had to."  Connors forwarded the email to SCG's Labor Relations Department.

On April 8, 2011, Valdivia was called to an investigatory interview.  The transcript of the interview reflects that when asked, Valdivia repeatedly denied that anyone had directed her not to contact Connors.  Following a short break, she stated she had misunderstood the question, and she acknowledged that Connors had emailed her the previous week, and had "made it pretty clear" to her that she was not to contact him.  When asked why she continued to contact Connors, Valdivia stated, "Cause I wanted to contact him; I'm human."

On April 12, 2011, SCG suspended Valdivia for two days for insubordination.  On April 20, 2011, Valdivia again called Connors.

On April 22, 2011, Gellinck met with Valdivia and gave her an "Interim Personnel Report" which stated that in February 2011, he instructed her "not to make contact with her ex-supervisor Mike Connors at any time unless the reason was work-related."  Valdivia refused to sign the report.

Valdivia's deposition testimony contains the following colloquy regarding what transpired at the April 22, 2011 meeting:  "I said:  Why can't I talk to Mike Connors?  [¶] He [Gellinck] said:  You don't know why you can't talk to Mike Connors?"  [¶]  I said: No.  [¶]  And I said:  Aren't you my supervisor?  [¶]  And he says:  Yes.  [¶]  I said:  You need to tell me why I can't talk to Mike Connors.  [¶] . . . .[¶]  Then I remember I told him, I said:  No.  I'm not going to sign this.  [¶] . . .  I'm going to talk to the union and see what I can do."  According to Valdivia, Gellinck kept hitting his fist on the desk, and

5

she told Gellinck, "Can you get me a shop steward? Can you get me a witness? I don't feel comfortable talking to you by myself. [¶] . . . [¶] And I remember I told him: You know what? It's 3:00 o'clock. I'm gone for the day. [¶] And I left."

Gellinck immediately advised Labor Relations Advisor David Sullivan of the incident. Sullivan told Gellinck to contact Lourdes Gutierrez in SCG's Employee Assistance Program (EAP) and Wellness Department. Gellinck spoke to Gutierrez, summarizing what had occurred on April 22, 2011, relaying Connors's concerns about Valdivia's excessive emails and calls, and describing the February 25, 2011 incident in Connors's office, Valdivia's insubordination in continuing to contact Connors, and Valdivia's temper flare-ups and mood swings that he had observed.

SCG's Workplace Violence Mitigation Team (WVMT) then met to conduct an internal review. The WVMT investigates and mitigates workplace situations involving potential threats against, or harm to, SCG employees. Based on its review, the WVMT referred Valdivia for a psychological evaluation to determine "whether there was a potential safety threat/concern and her fitness for duty."

On April 25, 2011, Gutierrez called Valdivia and wrote her two days later to advise her that she would be placed on paid leave pending a scheduled psychological evaluation. Valdivia was told, both in the call and in the letter, not to contact Connors. The letter "reiterate[d] that you <u>cannot</u> contact Mike Connors or his wife for any reason and you may <u>not</u> go near their house. IF YOU FAIL TO COMPLY WITH THIS INSTRUCTION, YOU WILL BE TERMINATED." (Emphasis in original.)

Valdivia disregarded this latest directive and continued to contact Connors by Facebook, text messages, telephone calls to Connors's office and cell phone, and messages from a pre-paid phone.

In early May 2011, Valdivia was evaluated by Dr. Perry Guthrie, a licensed psychologist, at the request of the Holman Group, which is the third-party administrator of SCG's EAP. In his report, Dr. Guthrie described Valdivia's lack of insight regarding the consequences of her actions and stated she presented herself as a victim of the

6

"dislike and perceived abuse from her two superiors, Larene Hammer and Greg Gellinck." Guthrie opined Valdivia had an "inability to perceive any wrongdoing on her part," and that she "never voiced any responsibility for misconduct or refusal to follow[] instructions given by her superiors. [She] consistently responded by saying that the problems only occurred following her filing a complaint with 'Ethics.' " Dr. Guthrie recommended that Valdivia "not return to work until she can demonstrate her understanding that she must comply with the professional boundaries at work and follow the instructions" of management. He recommended weekly individual psychotherapy.

Dr. Guthrie cleared Valdivia to return to work in late 2012 and SCG restored Valdivia to her former position in early 2013.

4. *Proceedings*.

In March 2012, while Valdivia was still on leave, she brought this lawsuit against SCG, Gellinck and Hammer. The operative first amended complaint pled 11 causes of action, including various violations of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), as well as defamation, intentional infliction of emotional distress and breach of the implied covenant of good faith and fair dealing.

On May 29, 2013, SCG, Hammer and Gellinck filed a motion for summary judgment. Following extensive briefing and oral argument, the trial court granted the summary judgment motion in its entirety.[1]

On January 15, 2014, Valdivia filed a timely notice of appeal from the January 2, 2014 judgment.

## CONTENTIONS

Valdivia contends she raised triable issues of material fact with respect to the following seven causes of action: (1) retaliation in violation of FEHA (first cause of action); (2) requiring a fitness for duty evaluation in violation of section 12940, subdivision (f)(1) (second cause of action); (3) failure to accommodate her disability

---

[1]     The pertinent issues and arguments on summary judgment, as relevant to the appeal, will be addressed in the Discussion section of this opinion, *post*.

(third cause of action); (4) gender discrimination (fourth cause of action); (5) interference with exercise of her rights, pursuant to Civil Code section 52.1 (fifth cause of action); (6) defamation (seventh cause of action); and (7) failure to investigate and maintain an environment free of harassment and discrimination (ninth cause of action).

## DISCUSSION

1. *Standard of appellate review*.

"We independently review an order granting summary judgment. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860.) We determine whether the court's ruling was correct, not its reasons or rationale. (*Salazar v. Southern Cal. Gas Co*. (1997) 54 Cal.App.4th 1370, 1376.) 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925.) We review for abuse of discretion any evidentiary ruling made in connection with the motion. [Citation.]" (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 504-505.)

2. *No triable issue with respect to first cause of action for retaliation in violation of FEHA*.

a. *General principles*.

In order "to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,'[2] (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the

---

**2** Protected activity by an employee includes complaining of or opposing conduct that an employee reasonably believes to be discriminatory. (*Kelley v. The Conco Cos.* (2011) 196 Cal.App.4th 191, 209.)

8

picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

b. *Prima facie case*.

In moving for summary judgment, SCG contended Valdivia could not establish a prima facie case of retaliation under FEHA because she did not engage in protected activity -- her three internal complaints (one in 2009 and two in March 2011) did not complain of any conduct prohibited by FEHA. Rather, in those three complaints, Valdivia merely complained of generalized poor treatment, such as undue behavior by a trainer and a bias in favor of management.

Valdivia, in turn, disputed SCG's assertion that she never reported a FEHA violation. Valdivia contended that in her March 20, 2011 call to the ethics help line, she complained of *sexual harassment* by Gellinck and Hammer, but SCG's written report of the phone call did not record that fact.

Assuming, without deciding, that Valdivia did complain of sexual harassment in her March 20 telephone call to the ethics help line, to make out a prima facie case Valdivia also was required to show a causal connection between her protected activity and the employer's adverse action. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) However, defendants Hammer and Gellinck both testified they were unaware that Valdivia had made a complaint of sexual harassment, as did human resources manager Leslie Edmonds and David Sullivan, who handled ethics complaints for SCG. Thus, Valdivia lacked evidence of a causal connection between her protected whistleblowing activity and the alleged adverse action by the employer, i.e., the two-day suspension for insubordination, the fitness for duty examination and her placement on a medical leave of absence.

c. *SCG's showing of legitimate nonretaliatory reasons for its actions*.

Assuming arguendo that Valdivia made out a prima facie case, the burden shifted to SCG "to offer a legitimate, nonretaliatory reason for the adverse employment action." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) To meet its burden, SCG showed (1) it

9

suspended Valdivia for insubordination in violating express directives to cease contacting Connors; and (2) it referred Valdivia for a fitness for duty examination after her course of conduct raised legitimate concerns about her behavior.

The evidence is undisputed that on February 25, 2011, while Valdivia was in Connors's office, Gellinck, her supervisor, directed her to leave Connors alone because Connors had nothing to do with her department.[3] Valdivia immediately disregarded Gellinck's directive. That same day, Valdivia emailed Connors yet again. Clearly, Valdivia was insubordinate to her supervisor. Further, Valdivia's relentless contacting of Connors, against Connors's wishes and in defiance of Gellinck's directive, raised legitimate concerns about her behavior. As a consequence, SCG reasonably required Valdivia to undergo a fitness for duty evaluation, and based on the results of the evaluation, reasonably placed her on leave while she obtained psychotherapeutic treatment.

The record supports the conclusion that SCG proffered legitimate, nonretaliatory reasons for the adverse employment actions of which Valdivia has complained.

        d. *Valdivia failed to raise a triable issue as to whether SCG's stated reasons were untrue, pretextual or retaliatory*.

Once the defendant employer has identified legitimate, nonretaliatory reasons for its actions, the burden shifts back to the plaintiff, who is then "required to ' "[d]emonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the] proffered legitimate reasons for [the] action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

---

**3**     Valdivia does not dispute that Gellinck uttered the words "leave him alone." Rather, her argument relates to how those words should be construed. In the appellant's reply brief, she argues, "There is a question whether just yelling 'leave him alone' at Valdivia and stalking off counts as a 'directive' or an 'instruction,' as opposed to 'intimidation,' 'bullying' or 'spleen.' Valdivia may not win at trial on this point, or other points – but she is entitled to a trial."

[Citations.]" ' [Citation.]" (*Reeves v. MV Transportation, Inc*. (2010) 186 Cal.App.4th 666, 674.)

As already discussed, the evidence is undisputed that Valdivia was unyielding in contacting Connors, against Connors's wishes and in defiance of Gellinck's directive. Valdivia failed to show there was anything implausible about SCG's position that the suspension, fitness for duty examination and medical leave of absence were measures taken to address Valdivia's inappropriate behavior. On this record, Valdivia failed to raise a triable issue that SCG's stated reasons for suspending Valdivia for two days for insubordination, requiring her to undergo a fitness for duty examination and placing her on leave, were untrue, pretextual or retaliatory.

We conclude Valdivia failed to raise a triable issue with respect to the first cause of action for retaliation.

3. *No triable issue with respect to second cause of action alleging a FEHA violation based on SCG's requiring a fitness for duty evaluation of Valdivia.*

At the time this matter was heard below, Government Code section 12940, subdivision (f), provided in relevant part that it is an unlawful employment practice, "[e]xcept as provided in paragraph (2), for any employer or employment agency to require any medical or psychological examination of an employee, to make any medical or psychological inquiry of an employee, to make any inquiry whether an employee has a mental disability, physical disability, or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition. [¶] (2) Notwithstanding paragraph (1), an employer or employment agency may require any examinations or inquiries that it can show to be job related and consistent with business necessity." (Stats., 2012, ch. 287, § 2.)

Valdivia contends there are triable issues of fact as to whether the fitness for duty evaluation was job related and consistent with business necessity. She argues that while she may have annoyed Connors, she was not in a dangerous job and she was performing

11

satisfactorily, so that a jury should be required to determine whether the fitness for duty evaluation was justified.

The argument is unavailing. A prophylactic psychological examination can satisfy the business necessity standard, even if the employee is not engaged in dangerous work. (*Brownfield v. City of Yakima* (9th Cir. 2010) 612 F.3d 1140, 1146 (*Brownfield*).)[4] Further, an employer is not required "to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries." (*Watson v. City of Miami Beach* (11th Cir. 1999) 177 F.3d 932, 935.)

We are mindful that fitness for duty examinations may not be used by employers "as a pretext to harass employees or to fish for nonwork-related medical issues." (*Brownfield*, *supra*, 612 F.3d at p. 1146.) Here, however, there is no basis to infer that SCG was engaged in a fishing expedition or that the fitness for duty examination was intended to harass Valdivia. The undisputed evidence of Valdivia's course of conduct directed at Connors gave SCG reasonable cause for concern. Valdivia's inappropriate behavior justified SCG's requiring Valdivia to undergo a fitness for duty examination. The fact that Valdivia's overall job performance was otherwise satisfactory, and that she was not engaged in dangerous work, was insufficient to raise a triable issue with respect to whether the fitness for duty examination was justified.

4. *No triable issue with respect to third cause of action for failure to accommodate Valdivia's disability.*

Valdivia contends she raised triable issues of fact in the third cause of action which alleged a failure to accommodate her disability in accordance with FEHA. This claim is predicated on the statutory provision which makes it an unlawful employment practice "[f]or an employer . . . to fail to make reasonable accommodation for the known

---

[4]     Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 218.)

physical or mental disability of an applicant or employee." (Gov. Code, § 12940, subd. (m).)

Valdivia's argument in this regard is as follows. The WVMT report noted that Valdivia has a bipolar diagnosis and was on medication for "mental health condition." SCG's actual knowledge of her mental disability triggered its obligation to explore with Valdivia reasonable accommodations. SCG made no showing that a reasonable accommodation was offered and refused, or that there was no vacant position within the company to which she could have been reassigned. Instead, SCG forced Valdivia to undergo a fitness for duty examination, compelled her to take a leave of absence and required her to see a therapist. Valdivia asserts, "[w]hether this was an 'accommodation' or is better characterized as 'retaliation' or 'punishment,' must be decided by a jury."

Valdivia's own deposition testimony undermines her claim that SCG failed to provide her with a reasonable accommodation. Valdivia testified: (1) when she was put on administrative leave in April 2011, she felt she was physically and mentally able to work; (2) she did not feel she had any restrictions on what she could do job-wise; (3) she never told anyone at SCG that she had a disability; and (4) she never asked anyone at SCG for some accommodation so that she could perform her job. Thus, Valdivia's view was that she did not have any disability, she did not need an accommodation, and she did not ask for one. Yet, Valdivia's position is that SCG somehow should have known better.

What SCG did know is that Valdivia had had some mental health issues in the past, and that she was manifesting inappropriate conduct, particularly with respect to Connors. Based thereon, SCG prudently required Valdivia to undergo a fitness for duty examination, put her on leave while she underwent psychotherapy, and kept her job open for nearly two years, until she was cleared to return to work.

Valdivia's theory that SCG should have reassigned her to another position instead of placing her on leave does not raise a triable issue with respect to a failure to accommodate her disability. As detailed above, Valdivia persisted in contacting Connors

13

via email, text messages, telephone calls and Facebook. Therefore, transferring Valdivia to another office would have done nothing to solve the problem. Here, the only accommodation that could have been provided was the one which SCG did provide -- it held her position open for nearly two years, and restored her to her position once she was medically cleared to return to work.

We conclude no triable issue exists with respect to the failure to accommodate claim.

5. *No triable issue with respect to fourth cause of action for gender discrimination.*

a. *Valdivia's allegations of disparate treatment.*

Valdivia's fourth cause of action, alleging gender discrimination in violation of FEHA (Gov. Code, § 12940, subd. (a)), asserted that soon after she complained about her supervisors, SCG discriminated against her "on the basis of her gender. Specifically, Plaintiff was subject to disparate treatment by Defendants in the terms and conditions of her employment, including writing up Plaintiff, suspending her, and forcing Plaintiff to see a psychologist."

b. *General principles.*

As with retaliation claims, a three-stage burden shifting analysis is applied to discrimination claims.

The plaintiff bears the initial burden to establish a prima facie case of discrimination. (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 354 (*Guz*).) Generally, to establish a prima facie case of discrimination, the plaintiff must provide evidence that (1) she was a member of a protected class, (2) she was qualified for the position she sought or was performing competently in the position she held, (3) she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. (*Id.* at p. 355.)

14

If the plaintiff makes out a prima facie case, a presumption of discrimination arises. (*Guz*, *supra*, 24 Cal.4th at p. 355.)

The burden then shifts to the employer to rebut the presumption by producing admissible evidence that its adverse employment action was taken for a legitimate, nondiscriminatory reason. (*Guz*, *supra*, 24 Cal.4th at pp. 355-356.)

If the employer does so, the presumption of discrimination disappears, and the burden rests with the plaintiff to attack the employer's proffered reasons as pretexts for discrimination, or to offer other evidence of discriminatory motive. (*Guz*, *supra*, 24 Cal.4th at p. 356.)

### c. *Valdivia's prima facie case*.

Valdivia's theory is that SCG "discriminated against her because she was a woman, insofar as she was punished and Connors was not." The flaw in this argument is that it disregards the factual context of this case. As already discussed, Valdivia persisted in seeking interactions with Connors, even though Connors asked her to cease and desist, and even though Gellinck expressly directed Valdivia to leave Connors alone.

In an attempt to frame this as a case of disparate treatment, Valdivia argues, inter alia, "Connors had many male friends who would talk to him without repercussion." However, Valdivia admitted she did not know how many emails these male friends were sending Connors, or whether Connors had requested any of those individuals to stop contacting him. As noted, Valdivia had sent Connors *hundreds* of emails and he had specifically asked her to stop communicating with him. The mere fact Connors had male friends who were permitted to email him does not begin to show a case of disparate treatment by SCG.

### d. *SCG's proffered nondiscriminatory reasons*.

Leaving aside whether Valdivia made out a prima facie case, SCG had legitimate, non-discriminatory reasons for its actions, as already discussed. Valdivia's insubordination led to her discipline. Her pattern of inappropriate behavior led to the fitness for duty examination and the ensuing period of administrative leave.

15

e. *No triable issue as to pretext.*

As discussed earlier, Valdivia failed to show there was anything implausible about the measures SCG took to address her inappropriate behavior. On this record, Valdivia failed to raise a triable issue that SCG's stated reasons for suspending Valdivia for two days for insubordination, requiring her to undergo a fitness for duty examination and placing her on leave, were untrue and a pretext for discriminatory animus based on her gender.

In sum, Valdivia failed to raise a triable issue with respect to the FEHA gender discrimination claim asserted in the fourth cause of action.

6. *No triable issue as to fifth cause of action for alleged interference with Valdivia's rights under Civil Code section 52.1.*

a. *General principles.*

Civil Code section 52.1, also known as the Bane Act, provides in relevant part: "(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals *of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state*, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured . . . . [¶] (b) Any individual whose exercise or enjoyment *of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state*, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages . . . ." (Italics added.)

The Legislature "enacted [Civil Code] section 52.1 to stem a tide of hate crimes." (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 (*Jones*).) Civil Code section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied

16

by a form of coercion." (*Jones*, *supra*, 17 Cal.4th at p. 334.) To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional or statutory rights by the requisite threats, intimidation, or coercion. (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843.)

"The word 'interferes' as used in the Bane Act means 'violates.' [Citations.] The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law. [Citation.]" (*Austin B. v. Escondido Union High School Dist*. (2007) 149 Cal.App.4th 860, 883 (*Austin B*.).)

b. *Valdivia failed to raise a triable issue with respect to the Bane Act*.

Valdivia asserts a violation of the Bane Act based on the April 22, 2011 meeting in Gellinck's office. She contends Gellinck "detained her with veiled threats of force and charges of insubordination during [the] meeting." She asserts she felt intimidated ("I swear, like he wanted to choke me") and that she did not feel free to leave. However, the undisputed evidence showed that Valdivia simply walked out of the meeting, unimpeded. She told Gellinck, "It's 3:00 o'clock. I'm gone for the day. [¶] And I left."

Moreover, Valdivia has not identified any statutory or constitutional right with which Gellinck allegedly interfered. (Compare, *Austin B*., *supra*, 149 Cal.App.4th at p. 882 [constitutional right allegedly interfered with was right to free public education, embodied in Cal. Const., art. IX, § 5].) In opposing summary judgment with respect to the Bane Act claim, Valdivia simply argued "Gellinck had no right to attempt to or prevent [her] from communicating with Connors." However, Valdivia has not shown she had a specific statutory or constitutional right to continue contacting Connors, in defiance of the wishes of Connors and SCG. Absent a showing of interference with her statutory or constitutional rights, Valdivia cannot raise a triable issue with respect to her Bane Act claim.

17

7. *No triable issue as to seventh cause of action for defamation*.

The essence of Valdivia's defamation claim is that defendants called her a "stalker," a "harasser," and "crazy."

a. *Procedural issues*.

In moving for summary judgment, SCG contended the statements about Valdivia were privileged because an employer's communications with persons who have a common interest in the subject matter of the communication are privileged (Civ. Code, § 47, subd. (c)), and here, the allegedly defamatory statements were communicated only among Valdivia's supervisor and the members of the WVMT, and only as part of SCG's assessment of and attempts to address ongoing concerns about Valdivia's conduct. SCG also argued below that even if the statements could be considered defamatory, Valdivia did not suffer any actual harm as a result thereof.

On appeal, SCG argues, inter alia, that certain alleged defamatory statements constituted nonactionable opinion. Because this ground was not raised below, prior to oral argument we notified the parties in accordance with Code of Civil Procedure section 437c, subdivision (m)(2) and invited supplemental briefing.

b. *Statements that Valdivia was a harasser and a stalker were nonactionable opinion.*

As this court stated in *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141 at pages 155-156, " ' "The sine qua non of recovery for defamation . . . is the existence of falsehood." [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. [Citation.]' (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) That does not mean that statements of opinion enjoy blanket protection. (*Ibid*.) To the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. (*Milkovich v. Lorain Journal Co*. (1990) 497 U.S. 1, 18-19 [111

18

L.Ed.2d 1].) The critical question is not whether a statement is fact or opinion, but ' "*whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.*" ' (*McGarry*, *supra*, 154 Cal.App.4th at p. 113.)" (Italics added.)

Here, the undisputed facts established that Valdivia sent Connors hundreds of emails as well as text messages, called him frequently, and even drove near his house. Further, she persisted in this behavior even after Connors and Gellinck unequivocally instructed her to refrain from contacting Connors. Given these circumstances, no reasonable trier of fact could conclude the statements that Valdivia was a stalker or a harasser declared or implied a provably false assertion of fact.

        c. *Other statements*.

Valdivia also relies on her deposition testimony that an employee named Charlene asked her, "What's this about you're crazy and you are stalking Mike Connors?" However, this unattributed statement, lacking any foundation as to the identity of the speaker who allegedly made this statement to Charlene who allegedly notified Valdivia of this statement, lacks ponderable legal significance sufficient to raise a triable issue. (See, e.g., *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005 [employee opposing summary judgment must offer substantial evidence to support a finding in his favor].)

As for Valdivia's claim that she was defamed by various other statements by coworkers referring to her as being "crazy," that issue is not properly before this court. The trial court sustained SCG's evidentiary objections to those statements[5] and Valdivia has not challenged the trial court's evidentiary rulings on appeal. Therefore, Valdivia cannot raise a triable issue with respect to those statements.

---

[5]    The trial court sustained, inter alia, SCG's objections Nos. 17, 24 and 27, thereby eliminating paragraph 21 of Valdivia's declaration (SCG employees told Valdivia that other employees were referring to her as being crazy), paragraph 4 of the declaration of Michael Elric (he heard other employees state they heard Valdivia is crazy), and paragraph 3 of the declaration of Laura Padilla (another employee told Padilla she had heard that Valdivia is crazy).

Accordingly, no triable issue exists on Valdivia's cause of action for defamation.

8. *No triable issue as to ninth cause of action alleging a failure to investigate and maintain an environment free of harassment and discrimination.*

Lastly, Valdivia contends there are triable issues of material fact on the ninth cause of action for failure to investigate and maintain an environment free of harassment and discrimination. (Gov. Code, § 12940.) Thus, the ninth cause of action is predicated on Valdivia's other FEHA claims.

Government Code section 12940, subdivision (k), makes it an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Because Valdivia failed to raise a triable issue with respect to retaliation, discrimination or harassment, her cause of action for failure to prevent discrimination and harassment necessarily fails.

**DISPOSITION**

The judgment is affirmed.  The parties shall bear their respective costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

EGERTON, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21