NOT FOR PUBLICATION

FILED

DEC 21 2017

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No.  AZ-16-1425-SKuF |
| DENNIS L. KOLODIN and CATHERINE KOLODIN, | ) Bk. No.  2:15-bk-07843-BKM |
| Debtors. | ) Adv. No.  2:15-ap-00793-BKM |
| TAPESTRY ON CENTRAL, L.L.C., | ) |
| Appellant, | ) |
| v. | ) **MEMORANDUM**[*] |
| DENNIS L. KOLODIN; CATHERINE KOLODIN, | ) |
| Appellees. | ) |

Argued and Submitted on October 26, 2017
at Phoenix, Arizona

Filed – December 21, 2017

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Brenda K. Martin, Bankruptcy Judge, Presiding

Appearances:     Ryan J. Lorenz of Clark Hill PLC argued for appellant; Evan P. Schube of Manning & Kass, Ellrod, Ramirez, Trester LLP argued for appellees.

Before: SPRAKER, KURTZ, and FARIS, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Tapestry on Central, L.L.C. ("TOC") appeals from the bankruptcy court's summary judgment in favor of chapter 7[1] debtors Dennis and Katherine Kolodin denying TOC any relief on its nondischargeability claims under § 523(a)(2), (4) and (6). TOC also appeals from the denial of its motion to alter or amend that judgment.

TOC asserts that the bankruptcy court erred when it ruled that TOC's claims were barred by the applicable statute of limitations. According to TOC, the statute did not run because its damages were not sufficiently certain until May 2013 – less than three years before TOC commenced its litigation. TOC also asserts that the bankruptcy court erred in concluding that equitable estoppel was inapplicable as a matter of law and in holding that Mr. Kolodin did not owe a continuing fiduciary duty to TOC.

None of TOC's arguments on appeal justify reversal. Accordingly, we AFFIRM.

**FACTS**

This appeal concerns a mixed use commercial and residential development in Phoenix, Arizona. Under a series of seven purchase contracts entered into in 2005, TOC, as the nominee designated by Yair Ben Moshe (TOC's managing member), agreed to buy seven commercial units located on the first floor of

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

building C of the development from developer Willowalk Property Limited Partnership. At the time, TOC believed it was purchasing all but one of the development's commercial units. The eighth commercial unit, on the far north side of building C, was to be purchased by Mr. Kolodin, who was acting as the joint broker for both the buyer and the seller.

While the architectural drawing relied upon in drafting the contracts showed eight commercial units, a replat recorded in 2004 showed the commercial space on the first floor of building C reconfigured into 12 commercial units. When the sale closed in 2007, as a result of the way the deeds were prepared and interlineated, TOC ended up with title to only seven of the 12 commercial units. Title to commercial unit numbers 9-12 remained with the developer Willowalk, and Kolodin ended up with title to commercial unit number 8, in the middle of the building, instead of receiving the unit farthest north, unit 12.

TOC discovered in 2010 that there was a discrepancy between the seven units it purchased and the additional units that actually existed but were not transferred from Willowalk at closing. Ben Moshe told a representative of the Tapestry on Central Condominium Association ("Association") that he intended "to sue Kolodin for incompetence and negligence, and the Seller to obtain title to the units." However, the Association and Kolodin worked to address the title defects and corrected most of the defects relating to the additional units in April or May 2011 when Willowalk deeded to TOC commercial unit numbers 9-11. Kolodin deeded commercial unit number 8 to TOC in February 2012, thereby completing the correction of the title defects.

3

Although TOC eventually received all of the commercial units it thought it had purchased, Ben Moshe did not believe that the transfers of the additional units addressed the harm caused by the title defects. He later described TOC's situation as follows:

> Since title to units 8 to 11 had never been conveyed to TOC, it could not sell the units, it could not lease the units, it could not build the space out, and to the day it actually acquired title, the space was vacant and still in the original grey shell condition it was in on the day it should have been conveyed in 2007.

Ben Moshe Decl. (Jan. 20, 2015) at ¶ 67. When he summarized the history of TOC's dispute with Kolodin and the Association, Ben Moshe reiterated that the delay in obtaining title to commercial unit numbers 8-11 effectively precluded TOC from leasing those units, and he further stated that, as a result, "I have lost millions in revenue from that space. . . ." Ben Moshe Letter to Neal Hansen (July 27, 2015) at p. 2.

Another issue eventually arose from the title defects. The Association insisted that TOC was liable for the assessments on commercial unit numbers 8-11 that accrued before TOC obtained title to those units. As described in more detail below, the parties initially attempted to negotiate a resolution of the pre-ownership assessment issue, but that resolution eventually fell apart.

In addition to the title defects and the assessment issue, the 2005 purchase entitled TOC to a certain number of surface and garage parking places to be allocated by the Association. Ben Moshe states that under the purchase agreements TOC was to receive 38 underground and 20 adjacent parking spaces upon the

4

purchase of the units. According to him, problems with the parking spaces began shortly after the sale closed in 2007 when the Association misappropriated some of TOC's parking spaces by reallocating them to the residential condominium owners. Ultimately, the amended governing Covenants, Conditions & Restrictions ("CC&Rs") recorded for the development allocated 20 parking spaces to TOC adjacent to the building. By the end of April 2007, the Association had substantially reduced TOC's parking spaces, leaving the commercial units without sufficient parking spaces for customers.

According to Ben Moshe, the Association's reduction of TOC's parking spaces "severely impacted" TOC's ability to obtain tenants for the commercial units. The problem with the parking spaces remained unresolved as of the time Willowalk and Kolodin conveyed the additional units to TOC. In Ben Moshe's view, the failure to provide the promised parking spaces effectively precluded TOC from leasing the commercial units:

> [W]ithout close and adequate parking, a tenant could not hope to generate enough patronage to turn a profit. This parking space grab has been the difference between a successful commercial aspect of the development and vacant space.

>                    *    *    *

> [Prospective tenants] have not been interested in such a horrific parking situation and occupancy of the commercial units has been virtually zero for eight years because of it.

Ben Moshe Decl. (Aug. 15, 2016) at ¶¶ 20-21; see also Ben Moshe Decl. (Jan. 20, 2015) at ¶ 45 ("Specifically, the parking and [construction] defects issues had still not been addressed and the [commercial units] could not be rented until these issues

5

were addressed as well.").

In support of Ben Moshe's generalized statements of harm, the record includes a letter dated September 3, 2010, to TOC from a prospective purchaser of the commercial units withdrawing its purchase offer, in part, because of insufficient parking for the units.

Despite these problems, and the ongoing harm they were causing, TOC did not immediately sue the Association, Willowalk or Kolodin. Ben Moshe maintains that the Association persuaded TOC to postpone the commencement of litigation. According to Ben Moshe, the Association was concerned that litigation would interfere with its efforts to reach a consensual resolution of the construction defect issues with Willowalk and the builders of the development.[2] Beginning in 2011, TOC and the Association

_____

[2] Ben Moshe stated that the construction defects were "rampant throughout the Tapestry development since 2007." Ben Moshe Decl. (Aug. 15, 2016) at ¶ 24. He specifically described the defects as follows:

> 1) a lack of firestopping between units and floors for plumbing and electrical penetrations; 2) on [sic] overheated and intolerable [sic] moist garage, which has been vented out of sidewalk vent towers on the storefronts of TOC's commercial units; 3) a defective rooftop HVAC chiller unit, which is supposed to provide adequate cooling for building C, and which to this day still cannot cool the entire commercial space; 4) a crack in a wall which was just fixed in October 2015 on a structural wall. The garage situation actually caused a large bay window to buckle in place.

Id. at ¶ 23. Initially, TOC suggested that the construction defects were part of its claims against Kolodin. TOC effectively claimed that Kolodin concealed the construction defects from TOC. However, at the summary judgment oral argument, TOC conceded that
(continued...)

6

discussed and negotiated resolution of the parking, title and assessment issues at length. Ben Moshe claims that in exchange for TOC's forebearance and after many months of discussions and negotiations, TOC and the Association reached an agreement in January 2013 to resolve all issues. According to Ben Moshe, the Association promised that it would release TOC from any condominium owner assessment obligations for commercial unit numbers 8-11 for the period before TOC received legal title to those units. The Association also promised to remediate the construction defects and to address the parking space issue once it completed a settlement with Willowalk and the builders.[3]

Ben Moshe contends that the Association reneged on its agreement in April or May 2013 by charging TOC for the pre-ownership assessments on commercial unit numbers 8-11 and by refusing to remediate the parking issue and the construction defects. This led to a plethora of litigation.

In January 2014, TOC sued the Association, Willowalk, Kolodin and others in the Maricopa County Superior Court for, among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with business expectancy and breach of fiduciary duty. But TOC only sued Kolodin in his capacity as a member of the

---

[2](...continued)
Kolodin had no responsibility for any damages arising from the construction defects and has reiterated that position on appeal.

[3] According to Ben Moshe, the construction defects dispute with Willowalk and the builders settled in early 2014, and the Association received the funds to fix the construction defects at that time.

7

Association's board of directors.

In January 2015, TOC sued Kolodin for the first time in his individual capacity for, among other things, fraud, breach of contract and breach of fiduciary duty. TOC claimed that Kolodin induced it not to hire an attorney to look over transaction documents (including the defective deeds). It also claimed that Kolodin should have but failed to obtain from TOC an effective waiver, after getting TOC's informed consent, regarding the conflicts inherent in Kolodin's dual representation of both Willowalk and TOC. TOC further alleged that Kolodin committed fraud by misrepresenting the number of commercial units on the first floor of building C and by misrepresenting the number of parking spaces that were to be assigned to it. TOC also asserted that Kolodin fraudulently concealed the development's construction defects. Finally, TOC complained that Kolodin breached the fiduciary duty he owed to TOC as its broker on the 2007 purchase transaction by serving on the Association's board of directors and actively siding with the board in the 2014 dispute regarding TOC's assessment obligations.

In June 2015, Kolodin and his wife filed their chapter 11 bankruptcy petition. Shortly thereafter, TOC commenced its nondischargeability action under § 523(a)(2), (4) and (6), relying upon the same allegations and claims it made in its state court action against Kolodin.[4]

---

[4] At no point either in the bankruptcy court or on appeal has TOC attempted to justify its nondischargeability claims against Kolodin's wife. Consequently, we will not address the bankruptcy court's grant of summary judgment in her favor.

8

In July 2016, Kolodin filed his motion for summary judgment focusing solely on statute of limitations issues. At the hearing on the summary judgment motion, TOC conceded all of its alleged losses as against Kolodin, except for the losses arising from the Association's failure to honor its January 2013 promises. Those promises included: (1) the promise to restore the parking spaces; and (2) the promise to release TOC from any liability for pre-ownership Association assessments. This was a critical aspect of TOC's defense against summary judgment. By conceding or ignoring the other damages allegedly caused by Kolodin's misfeasance, TOC argued there were no damages and its claims did not accrue until the Association repudiated its January 2013 promises in May 2013.[5]

The bankruptcy court was not persuaded. Relying mostly on TOC's and Ben Moshe's admissions, the bankruptcy court determined that Kolodin knew about the title defects, the assessment issues, and the parking issues certainly by no later than 2011. From these admissions and other undisputed facts in the summary judgment record, the court further determined that, by the time TOC discovered these three issues, it must have known about Kolodin's potential responsibility for these issues and the harm arising from them. Because it was undisputed that TOC learned of these issues no later than 2011 and did not file its tort action against Kolodin until 2015, the court held that its claims were

---

[5] On appeal, TOC has reiterated the same damages position: "If the Association had given TOC back its parking and accepted TOC's [limited] assessment payment[s], there would have been little or no reason to sue Mr. Kolodin." Appellant's Opening Brief (Mar. 1, 2017) at p. 21.

9

barred by the applicable Arizona statutes of limitations.[6]

Additionally, the court rejected TOC's argument that its damages did not arise, and its claims did not accrue, until its January 2013 agreement with the Association fell apart in May 2013. As the bankruptcy court explained, ". . . the very reason [TOC] was having [these] negotiations is because it had damages it was trying to offset against claims the HOA was asserting against it." Hr'g Tr. (Sept. 29, 2016) at 51:15-18.

Finally, the bankruptcy court sua sponte considered whether TOC's claims were equitably tolled. But, as a matter of law, the court found that the doctrine could not be applied to save TOC's claims from the statute of limitations because TOC did not sue Kolodin within a reasonable amount of time after the January 2013 agreement with the Association fell apart.

The bankruptcy court entered summary judgment in favor of Kolodin on October 7, 2016. TOC timely filed a motion to alter or amend the judgment on October 21, 2016, which largely rehashed the issues addressed in the bankruptcy court's oral ruling. After the bankruptcy court denied TOC's reconsideration motion, TOC timely appealed both the summary judgment ruling and the

---

[6] Claims for negligent misrepresentation or negligence are subject to the two year statute of limitations under Arizona law. Ariz. Rev. Stat. § 12-542(3); Hullett v. Cousin, 63 P.3d 1029, 1034 (Ariz. 2003); Elm Ret. Ctr., LP v. Callaway, 246 P.3d 938, 941 (Ariz. App. 2010). Claims for breach of a fiduciary duty are also subject to a two year limitations period. Coulter v. Grant Thornton, LLP, 388 P.3d 834, 838 (Ariz. App. 2017). Claims for fraud are subject to a three year limitations period. Ariz. Rev. Stat. § 12-543; Elm Ret. Ctr., LP, 246 P.3d at 941.

10

order denying reconsideration.[7]

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and we have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

1.  When did TOC's causes of action accrue for statute of limitations purposes?
2.  As a matter of law, is equitable estoppel inapplicable to Kolodin's assertion of his statute of limitations defense?
3.  Was Kolodin's alleged continuing fiduciary duty actionable under § 523(a)(4)?

**STANDARDS OF REVIEW**

We review de novo the bankruptcy court's grant of summary judgment. Salven v. Galli (In re Pass), 553 B.R. 749, 756 (9th Cir. BAP 2016). Under de novo review, the bankruptcy court's ruling is not entitled to any deference. Ulrich v. Schian Walker, P.L.C. (In re Boates), 551 B.R. 428, 433 (9th Cir. BAP 2016); Barnes v. Belice (In re Belice), 461 B.R. 564, 572 (9th Cir. BAP 2011).

**DISCUSSION**

**A.    General Summary Judgment Standards**

Summary judgment is appropriate when there are no genuine issues of material fact and when the movant is entitled to

---

[7] TOC did not address in its opening brief the bankruptcy court's denial of its reconsideration motion. Consequently, we decline to consider it. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 485 (9th Cir. 2010); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010).

11

judgment as a matter of law. Rule 7056 (incorporating Civil Rule 56); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Material facts are those that can affect the disposition of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Genuine issues are those the trier reasonably could find in favor of the nonmoving party. Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 1997).

To succeed on summary judgment, "[w]here the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Kolodin moved for summary judgment and bore the burden of proof on his statute of limitations defense.[8] See Olmos v. Ryan, 2013 WL 394879, at *2 (D. Ariz. 2013) (citing Kerwin v. Bank of Douglas, 379 P.2d 978, 981 (Ariz. 1963)); but see also Cytron v. PHH Mortg. Corp., 2016 WL 7187933, at *4 (D. Ariz. Dec. 12, 2016) (whereas the running of the statute of limitations is an affirmative defense, plaintiff bears the burden of proving any claim that the statute of limitations has been tolled or that the discovery rule applies). This was the sole basis on which

---

[8] The parties do not dispute that the substantive rule of law governing this matter is Arizona law. See generally Gaughan v. Edward Dittlof Revocable Tr. (In re Costas), 555 F.3d 790, 793 (9th Cir. 2009) (citing Butner v. United States, 440 U.S. 48, 54, (1979), and stating that the parties' rights and property rights in bankruptcy ordinarily are determined with reference to state law). When state law provides the applicable substantive law, it also provides the governing burdens of proof. Johnston v. Pierce Packing Co., 550 F.2d 474, 476 n.1 (9th Cir. 1977).

12

Kolodin sought and obtained summary judgment. Thus, Kolodin was required to establish that there was no genuine issue of material fact as to his affirmative defense.

**B.   General Statute of Limitations and Discovery Rule Considerations**

Arizona courts enforce the state's statutes of limitations "to 'protect defendants and courts from stale claims where plaintiffs have slept on their rights.'" Doe v. Roe, 955 P.2d 951, 960 (Ariz. 1998) (citing Gust, Rosenfeld & Henderson v. Prudential Ins. Co., 898 P.2d 964, 968 (Ariz. 1995)). On the other hand, under the discovery rule, "a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." Gust, 898 P.2d at 966. The discovery rule prevents statutes of limitations from beginning to run until "the plaintiff has a reasonable basis for believing that a claim exists." Doe, 955 P.2d at 960 (citing Gust, 898 P.2d at 967). The discovery rule applies not only to the plaintiff's discovery of the defendant's tortious conduct but also to all elements necessary to state a claim including the discovery of causation and damages. Commercial Union Ins. Co. v. Lewis & Roca, 902 P.2d 1354, 1358 (Ariz. App. 1995).

**C.   TOC's Arguments – and Concessions – on Appeal**

TOC's appellate arguments are narrow and technical in nature. TOC primarily argues that it could not have discovered its claims against Kolodin, for statute of limitations purposes, until the damages allegedly resulting therefrom were fixed and irrevocable. TOC also argues that, as a matter of law, it did

13

not wait an unreasonable amount of time in pursuing its claims against Kolodin after its January 2013 agreement with the Association collapsed, so the bankruptcy court erred when it determined on summary judgment that equitable estoppel could not preserve its claims. Finally, TOC argues that Kolodin owed a continuing fiduciary duty to TOC, even after the sale closed, and thus the statute of limitations could not have run on TOC's breach of fiduciary duty claim.

We will address each of TOC's appellate arguments in turn. But, before we do so, we should note some of TOC's key concessions. For instance, TOC has not disputed on appeal that, except for its damages argument, the bankruptcy court correctly applied the discovery rule and correctly held that all other aspects of its claims were known to it more than three years before it filed suit against Kolodin in January 2015. In addition, TOC has not challenged on appeal the determinations of the bankruptcy court that: (1) Arizona law applies to Kolodin's statute of limitations defense; (2) Arizona's statute of limitations for breach of fiduciary duty is two years; (3) Arizona's statue of limitations for fraud is three years; (4) no other statutes of limitations apply to TOC's claims against Kolodin; and (5) TOC did not commence litigation against Kolodin on the relevant claims until January 2015. Because of these concessions on appeal, we will accept as correct all of these determinations of the bankruptcy court. See Christian Legal Soc'y, 626 F.3d at 485; Brownfield, 612 F.3d at 1149 n.4.

**1.    Accrual of Causes of Action – Occurrence of Damages**

In light of TOC's concessions, the merits of TOC's appeal

14

largely turn on its argument that its damages did not become sufficiently certain, for claim accrual purposes, until its agreement with the Association fell apart in May 2013.

To support its argument, TOC relies on a series of four Arizona cases. Amfac Distrib. Corp. v. Miller, 673 P.2d 792 (Ariz. 1983); CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A. P.C., 7 P.3d 979 (Ariz. App. 2000); Commercial Union Ins. Co., 902 P.2d at 1354; Tullar v. Walter L. Henderson, P.C., 816 P.2d 234 (Ariz. App. 1991). These cases stand for the unremarkable proposition that malpractice causes of action do not accrue until the harm or damage from the defendant's conduct actually occurs. Amfac, 673 P.2d at 793-94; CDT, 7 P.3d at 982; Commercial Union Ins. Co., 902 P.2d at 1360; Tullar, 816 P.2d at 236. For purposes of the discovery rule, the plaintiff must sustain actual and appreciable harm before a cause of action accrues. Commercial Union Ins. Co., 902 P.2d at 1358. This occurs when the harm becomes irremediable or irrevocable. Id.[9]

However, the occurrence of harm and the extent of damages sustained are "two distinct concepts" not to be confused. Id. It is not necessary for a plaintiff to know the exact amount of its damages before the cause of action accrues, only that it has been damaged. Id. at 1359. "[A]ccrual requires only actual or constructive knowledge of the fact of damage, rather than of the total extent or calculated amount of damage." CDT, 7 P.3d at

[9] TOC's appellate argument assumes that Kolodin's alleged misfeasance falls within the ambit of professional malpratice and, hence, Amfac, Commercial Union Ins. Co., CDT and Tullar apply. For purposes of our analysis, we have assumed (without deciding) the same thing.

15

982.[10]

Here, by TOC's own admission, it knew Kolodin had caused it to suffer actionable harm long before its settlement with the Association fell apart. As Ben Moshe stated in his declarations, Kolodin's allegedly shoddy job in preparing the purchase contracts and the deeds directly led to the title defects, and to the Association's parking space misappropriation. Ben Moshe has steadfastly maintained that the title defects and lack of parking spaces have directly harmed TOC by severely impeding its ability to build out and rent the commercial units since the closing of its purchase in 2007. TOC admits that it knew of these defects since at least 2010.[11] Ben Moshe has been equally adamant that TOC's inability to rent out the commercial units cost it millions of dollars in revenue. TOC's damages for lost rents trace back to Ben Moshe's discovery of the title problems and the loss of parking spaces. Indeed, the title and parking problems were the impetus for TOC's settlement negotiations with the Association. That the specific amount of damages/lost rent was not fixed did not stop TOC's causes of action from accruing.

Moreover, TOC, through Ben Moshe, further admitted that it

[10] The scenario in which damages are not immediate is the exception to the rule. Commercial Union Ins. Co., 902 P.2d at 1360; see also Keonjian v. Olcott, 169 P.3d 927, 930 (Ariz. App. 2007) ("In the majority of malpractice cases, the damage or injury occurs contemporaneously with the malpractice."). Accord DeBoer v. Brown, 673 P.2d 912, 914 (Ariz. 1983).

[11] At page 4 of its opening appeal brief, TOC concedes it discovered in 2010 that it did not own commercial unit numbers 8-11 as a result of the defective 2007 deeds. At page 6 of the opening brief, TOC concedes it discovered in April 2007 the Association's misappropriation of its parking places.

16

already had connected its losses to Kolodin's alleged misfeasance before entering into settlement negotiations with the Association. As Ben Moshe put it, as soon as TOC learned of the title defects and the parking dispute, it wanted to sue Kolodin and Willowalk immediately, but the Association persuaded TOC to postpone such litigation.

Perhaps most telling, TOC has never explained how and why its third party settlement negotiations with the Association could affect the accrual of its claims against Kolodin. Nor are we aware of any legally sound explanation. TOC attempted to use its existing claims for damages to settle the Association's pre-ownership assessment claims against it. While the pre-ownership assessments may constitute a part of TOC's injuries, such harm arose from the title defects rather than the failed settlement.

In sum, as a result of TOC's own admissions, TOC obviously was aware that it had been damaged – and the alleged cause of those damages (Kolodin) – no later than 2010. By that point, TOC knew of the title defects and the misappropriated parking spaces.[12] Therefore, TOC's argument that it did not suffer appreciable damages until the Association reneged on its January

---

[12] In its summary judgment ruling, the bankruptcy court stated that TOC and Ben Moshe knew of the title defects and the parking issues certainly by no later than 2011. The bankruptcy court apparently referenced 2011 out of an abundance of caution. As our factual recitation set forth above reflects, Ben Moshe admitted knowledge of the title defects and the parking issues well before 2011, in 2010 and earlier. In any event, regardless of whether TOC's causes of action accrued in 2010 or 2011, the applicable statutes of limitations fully ran before TOC filed its state court lawsuit against Kolodin in January 2015.

17

2013 promises regarding the assessments and the parking spaces is without merit.

### 2. Equitable Estoppel[13]

The Arizona Supreme Court has identified the following factors as relevant in determining whether a defendant is equitably estopped from raising a statute of limitations defense:

> (1) whether the defendant engaged in affirmative conduct intended to cause the plaintiff's forbearance; (2) whether the defendant's conduct actually caused the plaintiff's failure to file a timely action; (3) whether the defendant's conduct reasonably could be expected to induce forbearance; and (4) whether the plaintiff brought the action within a reasonable time after termination of the objectionable conduct.

Nolde, 964 P.2d at 482.

Here, the bankruptcy court found, as a matter of law, that the amount of time it took TOC to bring its action against Kolodin was unreasonable. As the bankruptcy court pointed out,

---

[13] At the summary judgment hearing, the bankruptcy court stated that it sua sponte was raising the issue of "equitable tolling." But the principal case it relied upon, Nolde v. Frankie, 964 P.2d 477 (Ariz. 1988), dealt with the issue of whether the defendant was equitably estopped by his conduct from raising the statute of limitations defense. Under Arizona law, equitable tolling generally requires consideration of different factors than equitable estoppel. Compare McCloud v. Ariz. Dep't of Pub. Safety, 170 P.3d 691, 696–97 (Ariz. App. 2007), with Nolde, 964 P.2d at 481-82; see generally Hosogai v. Kadota, 700 P.2d 1327, 1331 (Ariz. 1985), partially superseded by statute as stated in, Jepson v. New, 792 P.2d 728, 734 (Ariz. 1990). Because neither the bankruptcy court nor the parties addressed the equitable tolling factors as part of the summary judgment proceedings, we decline to consider them on appeal. Absent exceptional circumstances not present here, we will not consider issues raised for the first time on appeal. See Rhoades v. Henry, 598 F.3d 495, 501 n.7 (9th Cir. 2010); El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines), 217 F.3d 1161, 1165 (9th Cir. 2000).

18

the settlement with the Association fell apart in May 2013, and yet TOC did not commence its litigation against Kolodin until January 2015. According to the bankruptcy court, this twenty-month delay was per se unreasonable.

TOC takes issue with this determination. In essence, TOC contends that the reasonableness of a plaintiff's delay must be considered on a case-by-case basis and depends on all of the surrounding circumstances, which makes the issue ill suited for determination on summary judgment. However, we can affirm on any ground supported by the record. Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014). We decline to decide the issue of whether the twenty-month delay was per se unreasonable because we can affirm on an alternate ground.

The Association's settlement conduct, on which TOC's estoppel argument relies, was insufficient as a matter of law to equitably estop Kolodin from raising his statute of limitations defense. As a threshold matter, it is far from clear whether a third party's settlement conduct – in this case the Association's – can or should serve as the foundation for estoppel against a separate litigant – in this case Kolodin. The only specific conduct TOC has attributed directly to Kolodin is cooperating in the settlement process and advocating on TOC's behalf with the Association's board. This is a slender reed on which to base estoppel, and TOC has cited no authority imposing estoppel based on such limited conduct.

Even if all of the Association's settlement conduct is somehow attributed to Kolodin, that conduct was insufficient to justify estoppel. A defendant will be estopped from asserting a

19

statute of limitations defense only if its conduct induced the plaintiff to forbear from litigation "by leading plaintiff to believe a settlement or adjustment of the claim will be effected without the necessity of bringing suit." Roer v. Buckeye Irr. Co., 809 P.2d 970, 972 (Ariz. App. 1990), cited with approval in, Nolde 964 P.2d at 481. When the defendant's conduct does not actually and reasonably induce the plaintiff to believe that its claim will be satisfied without the necessity of litigation, estoppel is inappropriate. Id.

Roer is instructive. In Roer, the plaintiffs sued an irrigation company and a canal company alleging that both companies' negligence had caused the plaintiffs' farmland to become waterlogged and useless as farmland. Id. at 971. As early as 1974, the plaintiffs had complained to the irrigation company that much of their land had been rendered unfarmable as a result of waterlogging. Id. at 972. Meanwhile, the canal company was responsible for a canal which traversed the plaintiffs' land and which exacerbated the waterlogging problem because it was not properly cleaned and maintained. Id. Over the course of several years, up until the time the plaintiffs commenced litigation in 1986, the defendants made various promises that they would look into the problem and take steps to ameliorate the conditions that were causing the waterlogging, but they never did so. Id. A jury returned a $1.3 million verdict against the defendants for the damage done to the plaintiffs' land, but the trial court granted the defendants' motion for judgment notwithstanding the verdict based on, among other things, the expiration of a two-year statute of limitations. Id.

20

at 971.

The Arizona Court of Appeals affirmed the trial court. In the process, the Roer court held, as a matter of law, that the defendants' respective promises to take steps to ameliorate the waterlogging problem were not sufficient to estop either of them from asserting the statute of limitations. Id. at 972-73. Roer explained:

> Prior to the filing of this lawsuit the plaintiffs never made any claim upon either of the defendants for the damages to their land. At no time did they indicate that they were holding them responsible, financially or otherwise, for the waterlogging. **As far as [the canal company] is concerned, its statements that it would clear and repair the canal do not constitute conduct which would support an estoppel. It never said that it would take care of the waterlogging damage but only that it would repair its canal.**

Id. at 972 (emphasis added).

Like the company in Roer, the Association (and Kolodin) allegedly promised to fix two of the problems that were causing TOC to lose rent: the parking space misappropriation and the title defects. However, there is absolutely nothing in the record that could support an inference that the Association, or more importantly Kolodin, agreed or promised to compensate TOC for the **damages** TOC already had incurred. As such, the Association's and Kolodin's conduct was insufficient as a matter of law to estop Kolodin from raising the statute of limitations defense. Neither the Association nor Kolodin led "plaintiff to believe a settlement or adjustment of [TOC's] claim [would] be effected without the necessity of bringing suit." Id. Accordingly, we reject TOC's equitable estoppel argument.

21

### 3. Continuing Breach of Fiduciary Duty

Finally, TOC contends that the bankruptcy court erroneously determined that Kolodin's fiduciary duty ended when the 2007 purchase transaction closed. TOC maintains that Kolodin had a continuing fiduciary duty to rectify the title defects and the parking space misappropriation. It further contends that, because Kolodin continued to breach his fiduciary duty until those errors were rectified, the statute of limitations could not have run on its breach of fiduciary claim. TOC alternately argues that Kolodin, at the time, was acting as a real estate broker and as an agent for TOC in other transactions, so Kolodin's fiduciary duty also was continuing in that respect.

TOC cites no authority to support its continuing breach of fiduciary duty argument. More importantly, there is another, more fundamental flaw in TOC's breach of fiduciary duty argument. The type of fiduciary obligation actionable under § 523(a)(4) is narrow in scope. "The broad definition of fiduciary under nonbankruptcy law — a relationship involving trust, confidence, and good faith — is inapplicable in the dischargeability context." Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (9th Cir. BAP 2011) (citing Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003)). As Honkanen further explained:

> To fit within § 523(a)(4), the fiduciary relationship must be one arising from an express or technical trust that was imposed before, and without reference to, the wrongdoing that caused the debt as opposed to a trust ex maleficio, constructively imposed because of the act of wrongdoing from which the debt arose.

Id. at 378-79 (citing Ragsdale v. Haller, 780 F.2d 794, 796 (9th

22

Cir. 1986)). Consequently, "trusts arising as remedial devices to breaches of implied or express contracts — such as resulting or constructive trusts — are excluded, while statutory trusts that bear the hallmarks of an express trust are not." Id. at 379.

To create an express trust under Arizona law, there must be "a competent settlor and a trustee, clear and unequivocal intent to create a trust, ascertainable trust res, and sufficiently identifiable beneficiaries." Golleher v. Horton, 715 P.2d 1225, 1231 (Ariz. App. 1985). Here, TOC never alleged – let alone proved – the existence of an express or statutory trust. Instead, it is clear from TOC's argument that it has been relying on the more general definition of a fiduciary relationship arising from Kolodin holding a position of trust, confidence and good faith. As set forth in Honkanen, this type of general fiduciary relationship is not actionable under § 523(a)(4). Honkanen, 446 B.R. at 378-79. Thus, TOC's continuing fiduciary duty argument does not support reversal of the bankruptcy court's summary judgment in favor of Kolodin.

**CONCLUSION**

Given that none of TOC's arguments on appeal has merit, we AFFIRM the bankruptcy court's summary judgment denying TOC any relief on its nondischargeability claims.

23